## Massachusetts Bonding & Insurance Company v. Duncan.

(Decided November 4, 1915.)

### Appeal from Muhlenberg Circuit Court.

1. Insurance—Accident and Disability—Susceptibility to Bleeding Not Disease.—In an application for insurance the assured represented that he was in sound condition physically, and that he did not have any local or constitutional disease. While carrying two heavy water melons against his stomach he slipped and ruptured a blood vessel. The assured had an inherited tendency to bleed persistently whenever any blood vessel, however slight, was ruptured, and was what is commonly known as a "bleeder," but it

did not affect or inconvenience him otherwise. No questions were asked him about his family history or inherited tendencies. Held, under the evidence, his susceptibility to bleeding was not a disease, and that his death was due to accidental means.

2.  Insurance—Accident and Disability.—The court will assume that the questions asked in the application will, if truthfully answered, give all the information needed or required in order for the company to determine whether it will accept the risk and issue the policy. The fact that the assured was an extra hazard and a risk that would not have been assumed had the company known other facts not inquired about will not void the policy on the ground of fraud or misrepresentation.

3.  Insurance—Accident and Disability.—Where the company reserved the right to examine the person of the assured in case of accident or disability at such times and in such manner as the company shall require, and in case of death shall have the right to make or participate in an autopsy, the company should make seasonable and prompt demands if it intends to rely upon such provision of the policy. Where the funeral had been announced and friends assembled for the services, the rights of the beneficiary were not forfeited when the funeral services and burial took place as announced, when the company had requested them to withhold burial and the request therefor was uncertain as to time, and there is no evidence that an examination of the body would have thrown additional light on the cause of death.

4.  Insurance—Refusal to Exhume Remains—Autopsy.—The court did not err in refusing to have the remains exhumed seven months after death where it did not appear that an autopsy would have disclosed the cause of death.

5.  Evidence—Statement of Assured to Physician—Res Gestae.—The statements of the assured to his physician as to the cause of his injury comes within the rule of res gestae and is, therefore, competent evidence.

E. B. ANDERSON and FRED FORCHT for appellant.

W. P. SANDIDGE and T. J. SPARKS for appellee.

OPINION OF THE COURT BY JUDGE NUNN.—Affirming.

On July 1st, 1913, David W. Duncan made a written application for, and there was issued to him on that date, a policy of accident and disability insurance which provided indemnity for loss of life or bodily injury from accidental means, and for disability and loss of time by disease. For accidental death the company agreed to pay $2,500 to Kate R. Duncan, mother of the assured, the appellee herein. On Thursday August 28th, 1913, David W. Duncan died as the result of an alleged accident which

happened on Saturday, August 23rd. In an action on the policy Mrs. Duncan recovered judgment for $2,500, and appellant brings the case here for review, complaining of many prejudicial errors which it says the trial court committed.

David W. Duncan was unmarried, 20 years of age, and resided with his parents in Greenville. He was in partnership with his father under the firm name of D. J. Duncan & Son. They were engaged in the insurance business and were local agents for the appellant. It seems that as such agents they had the power not only to receive applications but to issue policies of insurance, and for this purpose they were supplied with the necessary blank forms. It appears that the assured wrote on the same day with his own hand both the application and the insurance policy. These facts were fully and promptly reported to and approved by the company. The policy was issued in consideration of the payment of a monthly premium of $1.50, and was to continue in force for as many consecutive months as the assured might pay same. So far as payment of premiums is concerned it is admitted that the policy was in force at the time referred to, but appellant claims that the policy is void by reason of false and fraudulent answers made in the application.

By the application, which was written into and made a part of the policy, the assured represented to the company, (1) that he was in sound condition mentally and physically; (2) that he did not then and had not had during the past year any local or constitutional disease.

The company refused to pay the policy, and this suit was filed by the beneficiary, Mrs. Duncan, in January, 1914. Among other things she alleged that, while the policy was in force, her son died from a bodily injury, effected directly and independently of all other causes by direct ,external, violent and purely accidental means. In the following language, she explains how the assured received his injury:

"The said David W. Duncan was upon said August 23rd, 1913, engaged in carrying two large water melons, one under each arm, and while engaged in carrying said melons over a rough stretch of ground, one of said melons slipped forward and caused an injury to his stomach and bowels to such an extent that an uncontrollable hemorrhage resulted therefrom, and from the effects of which the said David W. Duncan died."

At the following April term of court the parties went into trial. During the course thereof appellee offered an amendment which the court permitted to be filed over appellant's objection. The amendment is as follows:

"The plaintiff by leave of court for amendment to her petition herein, and in order to conform to the proof, states that the accidental injury described in the original petition was caused not by the slipping forward of the melon as alleged therein, but by the strain caused by the carrying of said melons and the carrying of the melons over the rough or uneven ground over which he traveled while carrying same."

Appellant then traversed the allegations of the amended petition, and affirmatively alleged that the policy provided that if the assured should be disabled by a strain the recovery therefor should be $50 and no more. These allegations were controverted of record, but on the ground of surprise the trial was suspended and the case continued to the September term, when it was tried with the result already stated.

The following are the facts with reference to the death of the assured. On Saturday noon, August 23rd, 1913, five days before his death, he bought two water melons weighing 40 pounds each from a wagon which stood in the street in front of a neighbor's house. Carrying one under each arm and against his abdomen he started to his father's home, a distance of some 60 feet. He had to pass over a rough place and a perpendicular step-off, some 12 inches high. The assured told his physician that while so carrying these melons he slipped or fell. There was no one who saw him all of the time he was going home. The man who sold the melons, and Mrs. Martin also, saw him leave the wagon and go diagonally toward his father's front door. He placed the melons on the floor in the front hall and went immediately into his mother's room. She says he was nearly exhausted and breathing with difficulty. In a few moments he recovered somewhat and left the room, going in the direction of a closet in the garden. In two or three minutes his mother thought she heard his calls and went hurriedly to the garden and saw him holding himself up against a gate. His mother and sister assisted him to walk through the yard to the back porch. He was so exhausted that they laid him down. Almost immediately he lost consciousness. The neighbors and the doctor were called. When the doctor reached him he had been

placed in bed. The doctor described his condition as one of collapse, with rapid pulse, difficult breathing and abnormal temperature. He improved somewhat during the afternoon and was able to sit up awhile. He spent a restless night but on Sunday was able to eat a light breakfast and dinner. In the afternoon, when he undertook, by his mother's assistance, to leave his bed he fell to the floor in a faint. In about three hours he began to throw up blood and also passed a great deal of it from his bowels. The first blood thrown up was decayed, as if it had been retained in his stomach a while, but after that the blood he threw up and that which passed from his bowels was fresh. This continued until his death on the following Thursday. Dr. Koontz, who was first called, did not obtain full details of what had happened, and did not then realize the gravity of the case. When he grew worse the next day Dr. Slayden was called also. Each of these doctors had for a long time practiced in and were acquainted with the medical history of the family. Being now convinced that there was an internal hemorrhage they endeavored to find out the place and cause. In answer to their inquiries, the assured said to Dr. Slayden that while he was carrying the water melons he slipped or fell, Dr. Slayden did not remember which, and received a strain where the melons pressed against his abdomen, and he at once became ill.

Briefly stated, the reasons given by the company for resisting payment are that Duncan's death was not due to any personal injury effected by accidental means; that he was the victim of a spontaneous hemorrhage; that at the time the application was made and for many years theretofore, in fact, all of his life, the assured was in bad health and in an unsound physical condition and suffering from a dangerous constitutional disease, technically known as haemophilia, that is, he was what is commonly known as a "bleeder;" that this disease culminated in a spontaneous hemorrhage, and was the sole cause of his death. The particular characteristic or symptom of a "bleeder" is that in the event of an injury, causing a wound in the flesh, internal or external, there immediately results a persistent flow of blood, causing weakness and exhaustion, difficult to arrest, and, if not stopped, will result in death. We understand from the evidence that in such cases, as distinguished from normal persons, the walls of the blood vessels may be thinner, but usually it

is a blood condition whereby it does not coagulate and automatically stop the flow.

The assured made categorical answers to every question set forth in the application. We must assume that such answers, if true, supplied to the company all the information needed or required by it in order to determine whether it will accept the risk and issue the policy or continue it in force. No inquiries were made about his family history and he was not asked if he was a haemophiliac or a "bleeder" or if a slight wound subjected him to copious or persistent bleeding, nor was he asked if his physical condition was normal as compared to other people. The question propounded was whether he was in sound physical condition. He answered that he was, and further represented that he was in good health, and to the question if within a year past he had a constitutional disease, he said "no."

We are satisfied from the evidence that in carrying the water melons over the rough place he slipped or stumbled and the strain or pressure thus made against the stomach ruptured a blood vessel. We think it was also made clear that the young man was a "bleeder." The proof shows this to be an inherited characteristic. From the medical testimony it seems that the symptoms are more pronounced in the male line, although, as a rule, it is inherited directly from the mother. His maternal grandfather was a "bleeder," and his mother was to some extent. Between two and three years before the application, three teeth were extracted and his gum bled at one place for several days, and he was indisposed for a week. When he was ten or twelve years of age he had a nasal hemorrhage which lasted for several days. Two or three other instances were shown where from slight wounds there was a profuse flow of blood, and in this, as well as the instances already referred to, medical services were availed of to staunch the flow. Some of the text writers say that in some cases there have been instances of spontaneous bleeding, but with one exception, all of the doctors testified that there must be a cause for such bleeding, although the cause may not be ascertained. In every case there must be a ruptured blood vessel; therefore, there must be something to rupture it, and when spontaneous hemorrhage is assigned as a cause of death it signifies that the cause of the rupture is not known. The physicians all testified, having in

mind his tendency to bleed, that in their opinion an internal hemorrhage would be produced in the assured if he carried the two melons in the manner described. It is also clear from the evidence that the company would not have issued or carried the policy had it known that the assured was a "bleeder." The assured of course must have known that in the instances referred to he had bled persistently, but it is not shown that he knew the significance of it. In other words, he did not know he had an inherited condition of vein walls or of blood that would probably continue through life, and always subject him to dangerous bleeding whenever any blood vessel, however slight, was ruptured. On this branch of the case we believe the question comes down to whether the condition described was equivalent to a disease. If so there was a material misrepresentation of fact, for he answered that he had no disease. As to what haemophilia is the appellant quotes the Century Dictionary, Vol. 4, page 2791:

"A congenital morbid condition characterized by a tendency to bleed immoderately from any insignificant wound, or even spontaneously. Also called hematophilia, hemorrhaphilia, and hemorrhagic diathesis."

Dr. Osler and others in their text books give substantially the same definition, and they refer to it as hemorrhagic diathesis.

Dr. Koontz, a witness, was asked "Whether or not hemorrhagic diathesis is a constitutional disease." Answer. "I do not consider any diathesis a disease." Question. "Is hemorrhagic diathesis a constitutional disease or not?" Answer. "It could not be in my opinion." In making out the proof of loss Dr. Koontz had stated: "The *disease* was naturally of a hemorrhagic diathesis which, in my judgment, was a potent factor in his fatal illness." Counsel for appellant asked him to state "what do you mean by hemorrhagic diathesis," to which he answered, "Diathesis means a susceptibility, a vulnerability to disease. Hemorrhagic merely qualifies pertaining to hemorrhage; being a potent factor means that it was one of the most important things in my judgment in the case." Dr. Slayden said that "Duncan was of a hemorrhagic diathesis, but that is a vulnerability, not a disease." One may be vulnerable to tuberculosis by an inherited predisposition, and still may never have it. One's skin may be thin and in that way he may have an inherited vulnerability to sunburns and yet keep free of them.

In the same way, one may be vulnerable to hemorrhages, that is, by inheritance be more susceptible to them than others, yet he may never have a hemorrhage.

The testimony of Dr. Furgerson and Dr. Tichenor is to the same effect. The evidence of these doctors, as well as other witnesses who were intimately acquainted and associated with the assured, shows that he was in good health, up and about at all times, attending to all his duties. Except the instances of bleeding already referred to, his complaints were no different nor more frequent than those of the ordinary person. When the applicant answered that he was sound physically it did not necessarily mean that he was as sound, or that his anatomy was as perfect as the strongest or even the average man. The question related only to his own condition measured by what it had been, and by the answer one naturally infers that he was sound as compared to his condition theretofore. In this particular it was for the jury to determine from the evidence whether the assured made truthful answers. The jury believed that his answers were truthful, and we are of opinion that the evidence sustains their verdict.

The next question relates to the request by the company to withhold burial, and to the right of the company to make an autopsy upon the body of the assured. The policy contained this provision;

"The company shall have the right and opportunity to examine the person of the assured in case of accident or disability, at such times and in such manner as the company shall require, and in case of death shall have the right to make or participate in an autopsy upon the body of the assured where not forbidden by statute."

On the 27th of August, the father of the assured addressed and mailed a letter to the company at Boston, setting out in detail the manner in which the assured had received his injuries, and stating that in the opinion of the attending physicians there was no hope for his recovery. On the next day he died, and the father sent to the company at Boston this telegram:

"My son David W. died at 2:30 this afternoon, result of injury received August 23rd. See letter of August 27th." Signed, "D. J. Duncan."

This telegram went as a night letter, that is, was not to be delivered until next morning. It was delivered to the company at 10 o'clock on the morning of August

29th. It seems that the letter had not been received at that time. The company sent the following telegraphic reply, which the father received at 1:30 o'clock that afternoon:

"Legal department in absence of details requires further investigation. Adjuster will be in Greenville immediately. Withhold burial as autopsy may be necessary."

The weather was warm; he died the day before at 2 o'clock; funeral notices had been distributed among friends, and all arrangements had been made for the burial that day at 4 o'clock. During the next two and one-half hours, the interval between the telegram and the hour fixed for the funeral, the adjuster did not appear and no word came from him. Instead of postponing indefinitely, and dismissing the company of friends, they proceeded with the funeral as announced. By this telegram the company did not demand an autopsy or say that one would be demanded, or even be necessary. It amounted to a request to withhold the burial for an indefinite time—until the adjuster got there. The telegram did say that the adjuster would be there immediately, but he did not come immediately, and the family receiving no word from him, and having no information as to his whereabouts, they could not know how long it would be necessary to hold the remains in order to comply with the request. That day, after the burial, the adjuster in Owensboro did call some friend in Greenville, not connected with the family, and in that way received the information that the interment had already taken place. Subsequently numerous letters passed between the company and the father, who was acting for the beneficiary.

The following taken from a letter of September 25th, illustrates the manner of request or demand made by the company for an autopsy:

"Will you be good enough to advise at once whether or not you will permit said autopsy?"

On November 6th, the company wrote:

"We desire permission immediately to disinter the body of said David W. Duncan for the purpose of performing an autopsy thereon."

It is the contention of Mrs. Duncan that she neither refused nor granted permission to disinter the remains or to make an autopsy. Technically, her position was one of neutrality, although there is no attempt to conceal a

natural feeling of abhorrence to the idea of reopening the grave. The only evidence to show a denial of the request comes from Mr. Carey, employed by the appellant as a claim examiner, and he says that on the 14th of October, 1913, he met Mr. D. J. Duncan, the father, at the Seelbach Hotel in Louisville, in an effort to adjust the claim. Carey says he then requested permission to make an autopsy, and that Mr. Duncan "refused to permit an autopsy, stating that he wished said defendant company to examine certain proofs of claims about to be filed with defendant company, and that he thought * * * the company would pay the claim * * * upon a basis of the information contained in said proofs." At the April term of court the company entered a motion, supported by affidavits, and for the first time made formal demand to have the remains exhumed and an autopsy held. The appellee filed a response in which she maintained her position of neutrality, that is, said she had never denied nor consented to an autopsy. The court overruled the motion, and, in our opinion, properly so. The motion was addressed to the sound discretion of the court, and it was incumbent upon appellant to show with reasonable certainty that an autopsy then made would disclose bodily conditions from which it could be determined whether the assured died of disease or accident. Had it been a case of suspected metallic poisoning, no doubt an autopsy made even seven months after burial would have thrown light on the question, but where the conceded cause of death was a ruptured blood vessel, a condition involving tissues and membranes only, it is doubtful if an autopsy at any time would have shown whether the rupture was spontaneous or accidental. and especially is this so if made at a time when decomposition was so far advanced. The depositions of several doctors who testified on the trial accompanied the motion for an autopsy, but except in the case of Dr. Koontz, there was absolutely no showing from any of them to indicate that an autopsy would be of any aid in determining the question. And the testimony of Dr. Koontz was not sufficient to justify the court in sustaining the motion. Dr. Koontz in answering the question whether a hemophiliac might have internal hemorrhage spontaneously said: "It might be possible, but without some cause, a very improbable thing in my opinion." He was then asked: "State to the jury whether or not an autopsy performed on the body of David W.

Duncan would have shown what was the cause of the internal hemorrhage." Answer: "It may have and may not have. I judge it would have at least given some information; I doubt that." Question: "It would have been a help, would it not, doctor?" Answer: "It would have been, but as to its being specific, I rather doubt it." It does not appear that the testimony of this doctor refers to the time when the motion was made. In all probability he referred to the time of death. We are satisfied that the evidence does not show sufficient reason for ordering a disinterment and autopsy in April, seven months after the burial, and the question of error can only be measured by the ruling at that time. We are of the opinion that the policy was not voided by a failure to withhold burial, or by the failure then to give consent to an autopsy, or by refusing permission on the 14th of October, the time referred to by Mr. Carey, which was 45 days after the burial. Certainly no positive demand was made for an autopsy before the time referred to by Mr. Carey, and Mr. Duncan's response to him hardly amounts to a refusal. He suggested certain proofs in lieu. In Granger Life Insurance Co. v. Brown, 57 Miss., 308, 34 Am. Rep., 446, the court said:

"We are not prepared to say that in a proper case the court, in the interest of justice, should not compel the exhuming and examination of a dead body which is under the control of the plaintiff, if there is strong reason to believe that without such examination a fraud is likely to be accomplished and the defendant has exhausted every other method known to the law of exposing it."

But in this case neither the evidence nor the affidavits show that an examination would disclose anything material. The company never demanded an autopsy and did not exhaust its efforts to have an examination.

During the boy's illness the father notified the company by letter of the accident and the probable consequence. While the company had not received this letter when it received the telegram giving notice of death, yet in ordinary course of the mails the letter should have been in the hands of the company at that time, and the father naturally so believed. Measured by the custom in that section, the burial was not hasty, and we are satisfied that none of appellant's rights were violated when the remains were buried as theretofore planned, and, under all the circumstances, the appellee did not thereby

forfeit her rights, particularly when it is not shown that an examination of the body would have thrown any additional light on the case. Wehle v. U. S. Mut. Accidt. Assn., 152 N. Y., 116, 47 N. E., 35; 60 Am. St., Rep., 598.

The company argues that since the assured was its agent there was no one at Greenville upon whom it could rely to protect its interests, therefore it could not act immediately. This circumstance made it necessary to send an adjuster from some other point. But the telegram did not make it known who the adjuster would be, or from what point he would come or how much time would be required. The disadvantage to which it might be placed in this particular case must be considered as waived by the company when it accepted an application from and issued a policy to its own agent.

We are of opinion that the evidence of Dr. Slayden with reference to the statement the young man made to him as to how he was injured was competent. Omberg v. U. S. Mut., etc., 101 Ky., 303.

Appellant insists that if the deceased suffered from a strain he can only recover $50. Section 13 of the policy provides that if the assured be disabled within six months "by rheumatism, tuberculosis * * * strains * * * then the company will pay the assured $50 per month for the number of months that the assured is confined or disabled thereby." As already stated, the policy provided indemnity for death or disability due to accident, and for disability due to certain diseases. The $50 per month for a strain covered such time as he may be disabled thereby, but was not intended to be in satisfaction of a claim for death, if it resulted therefrom.

We perceive no error in the instructions, and on the whole case we are of opinion that the judgment should be affirmed, and it is so ordered.