Sarah A. Cantrall, Appellee, v. Great American Casualty Company, Appellant.

Gen. No. 8,388.

48

Opinion filed February 3, 1930.

JOHN G. FRIEDMEYER and CHARLES S. ANDRUS, for appellant.

JOSEPH A. LONDRIGAN and JAMES E. LONDRIGAN, for appellee.

MR. PRESIDING JUSTICE ELDREDGE delivered the opinion of the court.

Sarah A. Cantrall, appellee, recovered a judgment against appellant for the sum of $5,450 in an action

of assumpsit based upon a policy for accident insurance.

Alvin W. Cantrall, late husband of appellee, made his application to appellant for a policy of accident insurance on December 9, 1926, on which application the policy was issued. At the time of his death, Cantrall was, and had been for about 12 years, superintendent of the repair department of the Jennings Auto Sales Company in the City of Springfield. The repair department in which the deceased worked was on the second floor of the building. There was a large elevator in the west end of the building upon which automobiles were taken to the second floor and there repaired. On the morning of the eighteenth day of January, 1927, the deceased, in apparent good health, went to his work as usual. The weather on this day was damp, cloudy, cold and heavy. The repair room had several windows in it but whether any of them were opened that day, the evidence is not clear. The air in the shop became foul from the exhaust of running motors and several other employees during the day were more or less affected thereby. In the afternoon, the deceased complained of a headache and was seen to stagger and walk in a draggy manner and complain of having gotten too much gas. At about 3:30 p. m. he asked another man to take over the shop and said he had too much gas and was going home. Some of the employees offered to take him home but he declined their assistance, saying that he had his automobile outside and could get home all right. He lived about a mile and a half from his place of work, and when he reached home, his wife and daughter assisted him out of his automobile and into the house, and he was immediately put to bed. Doctor Locke, the family physician, was called and saw him about 5 o'clock that evening and gave him treatment for carbon monoxide poisoning. The doctor called on him

again later that night and several times thereafter and he apparently seemed to be recovering. He died suddenly between 8 and 9 o'clock in the morning, January 20, 1927.

It is firmly established that an injury or death caused by the unconscious or involuntary inhalation of poisonous gases, is an injury or death caused by accidental means. *Fidelity & Casualty Co. v. Waterman,* 161 Ill. 632; *Travelers' Ins. Co. v. Ayers,* 217 Ill. 390, and cases cited.

Appellant filed the general issue and six special pleas. The first special plea is based upon a false answer to question "N" in the application which inquired as to whether the applicant at that time was in sound condition physically and mentally and to which he answered, "Yes," and this answer is alleged to have been false. There is no evidence in the record to sustain this plea. There is no evidence which even tends to show that the insured was not in sound condition, physically and mentally, when he signed the application.

The second special plea avers that the insured did not die as a result of bodily injuries affected directly and independently of all other causes through external, violent and accidental means as required by the policy, but died of bodily diseases and other causes not caused directly by any bodily injury affected directly and independently of all other causes through extreme, violent and accidental means. The evidence clearly establishes that the insured had been a steady workman for about 12 years and there is no evidence that he had ever lost any time from his work on account of illness except that at one time more than a year before he had been poisoned by monoxide gas from which he had recovered within two or three days. The witness Burnett testified that he was employed in the repair shop and had worked under the insured in

the shop for about five years and saw him every day, never noticed anything unusual so far as his health was concerned. The witness noticed the gas was bad in the garage on the afternoon of January 18, 1927; that it came from running motors; that between 35 and 40 cars came into the garage that day; that while the cars are being repaired frequently their motors are running and the exhaust goes into the center of the room and that the insured spent most of his time in the center of the room and at his desk, that he noticed that the gas was bad because he, himself, had a very bad headache; that the gas in there that day was more than usual from the exhaust from the automobiles; that he noticed the deceased sitting on a bumper on the front end of the car back of which he was working, and was kidding him about being lazy and then noticed him go to his desk and put his elbows to his head; it wasn't long before he saw him going to the locker room and the last time he saw him, he was going out of the door to go home; he was staggering; it was about 3:30 p. m. when he left the shop; the windows of the room are not always open on cold days; motors were being repaired and were being run to test them out; the automobiles for repair were put on the south side of the building and the ventilation is at the south for the purpose of light as well as ventilation, so the mechanics can see to do their work better; there is quite a space back of the cars, to the north of the cars; Cantrall's desk was located at the east end of the room and would be behind the cars and would get all the exhaust; his duties were all over the shop. The witness Ross testified that he was working in the shop on the day in question and the air was heavy and he noticed gas and smoke that would lay in the building; when Cantrall left the building that afternoon, there were six to ten cars in the shop; noticed nothing unusual about him until in the afternoon when he noticed him with his

head resting on his arms at his desk and saw him
stagger to the washroom and followed him in; he said
he had too much gas and had to go home. Ross insisted
that he should get somebody to take him home; he said
no, that his car was there and he would take it himself
in a few minutes; as a rule, if it gets bad in there in the
wintertime, the men will leave a window open long
enough to clear the room and let the air in, then pull it
down again; it is a large place and hard to keep warm
in the winter with all the windows open. The witness
Johnson testified that Cantrall was a steady worker;
that he noticed there was a lot of gas in the garage
which came from the running of the motors in the gar-
age and that he, himself, had a headache therefrom;
that he noticed that Cantrall was sick about 3 o'clock
and saw him on the fire escape first trying to get some
fresh air and then saw him go to his desk and lean
over with his head in his hands; he was back on the
fire escape when he first noticed him in the open air; he
asked to take him home but he said no that he could
make it all right; the gas was heavy that day; it was
a kind of mist and rain, misty like, when that kind
of weather comes, the atmosphere is low and damp
and the gas is low and heavy; don't remember whether
the windows were open or not; it was cold and the
windows were not opened as the workmen would
rather stand the gas. Dr. G. D. Locke testified that
he had known the insured for 12 or 15 years and
that the general condition of his health was good;
that he saw him on January 18 at his home in bed
about 5 or 6 o'clock and made an examination of
him; the first thing that was called to his attention
was the extreme florid condition of his skin; his face
and hands looked like a man with a high temperature;
he had difficulty in breathing and extreme weakness,
dilation of the pupils and pounding pulse, respiration
labored, normal temperature; he made a diagnosis that

he was suffering from carbon monoxide poison; opened the windows, applied heat to his body, stimulated the heart with strychnine and nitroglycerine and kept him as warm as he could; saw him again that night about 8 or 9 o'clock and three or four times the next day; he died on the morning of January 20 very suddenly; saw him at 2 o'clock in the morning and feeling that he was better and perhaps out of danger and did not again see him until after he was dead; that he diagnosed his death as due to carbon monoxide inhalation; his opinion is that he was suffering from carbon monoxide poison which he had breathed; the cause of the death in his opinion as he gave it in his death certificate and in his report before the coroner's jury was due to carbon monoxide poison; his acute condition was superimposed upon a chronic exposure to carbon monoxide. Dr. J. R. Higgins testified on behalf of appellee as an expert. He resided at Gillespie, Illinois, which is located in a coal mining district, and he was chief surgeon for the Superior Coal Company which employed 3,000 employees. There is a school at Gillespie for the purpose of training men to detect gas. He examined all men who took such tests. He testified in substance that coal mines often contain many gases, chief of which are carbon dioxide, carbon monoxide and hydrogen sulphide; that he had had experience with industrial accidents and a number of cases of people overcome with gas were brought to the hospital and observed by him; the exhaust of automobile motors is very similar to gas that you find in mines except that there is greater amount of carbon monoxide gas from automobiles; does not think that an autopsy performed two weeks after death would reveal whether the death was caused by carbon monoxide poisoning and does not think you could at such time find sufficient gas to justify such conclusion, and that it would be hard to tell in two or three days;

a blood test taken immediately after death might show the cause of death; gaseous poisons would probably escape and no one can tell how long gas would remain combined with the blood; in answer to a hypothetical question put to him, he stated that in his opinion the insured died from an acute attack of carbon monoxide poisoning.

To meet the above evidence, appellant introduced the evidence of three physicians who testified as experts. Dr. Deal, in answer to a hypothetical question, stated that in his opinion the death of insured was not caused by carbon monoxide poisoning; the effect of inhalation of carbon monoxide gas on the vital organs and tissues of the human system where the patient has been exposed to such gas for a period of about five years in different quantities would be the development of a comparative immunity to carbon monoxide, that is, so that such person would resist it better, like one who becomes acclimated to a higher altitude, so you can with carbon monoxide breathing; where there is extreme exposure such as chronic exposure constantly there may become chronic changes; that means that by this chronic exposure every day over a long period which produces headaches every day and a little nausea and sickness; the authorities say chronic exposure makes some changes but that he did not know about that in his experience; he had never been present at an autopsy upon the body of a man who died from carbon monoxide poison and did not know as to what the findings would be; that he was relying a great deal upon standard literature that he had read; from the facts stated in the hypothetical question as to the condition of the man, it would look highly suspicious of the heart; unless the autopsy was performed within a short time, the blood condition would not give any information as to carbon monoxide; that his opinion is that the gas leaves the body within 10 or 12 hours after

exposure; florid condition of the face, difficulty in breathing, extreme weakness, dilation of the pupils, respiration labored with normal temperature, semiconsciousness are found in carbon monoxide poisoning; there has been considerable dispute in the past as to the effects of carbon monoxide gas but he thinks they just about agree now, but you can pick out different authorities here and there; they have different ideas about it. Dr. Patton, in answer to a hypothetical question, stated that he had an opinion as to whether the insured died from the effect of carbon monoxide poisoning. When asked what his opinion was, he said he thought the death might have been due to one of several causes, "Angina pectoris, a coronary thrombosis,—that is, a thrombosis of the blood vessel that goes to the heart; embolus, that is, a detachment of a portion of the blood clot that gets into the circulation, a ball thrombosis, which is a clotting of the blood in one of the chambers of the heart which produces sudden death or cerebral hemorrhage"; if an autopsy had been performed upon the body before its burial, the exact cause of the death might have been determined, not from carbon monoxide itself, but the secondary changes that had come from oxygen depredation which would have produced lesions that would have been determined at the autopsy; that evidence would be present if the autopsy had been performed two or three weeks after his death; a florid condition of the face, difficulty in breathing, dilation of the pupils, respiration labored, temperature normal, semiconsciousness and somewhat irrational are among the symptoms found in monoxide poisoning. Whether a man dies immediately from monoxide poisoning or lives a few days depends entirely upon the length of the exposure and the concentration of the gas; the whole thing is the amount of gas that the man has at the time of the exposure, the length of time that he

is in that environment and the rapidity with which he gets into the open air and allows the interchange of the gases to take place; any exposure to gas that is sufficient to produce unconsciousness over a long period of time is sufficient to deprive the brain tissue of oxygen and produce secondary changes in the brain, which might cause his death a few days or several days or many days afterwards; the practice of medicine is not a science; it is an art; there were no definite rules to fit all cases; you can simply record your observations and make deductions from your observations. Dr. Herndon, in answer to the hypothetical question put to him, stated that in his opinion the insured did not die from the effects of carbon monoxide poisoning because of the length of time that he lived following the possible exposure and because of the suddenness of his death; that in his opinion, if an autopsy had been held within two or three weeks after the death the cause of death could have been determined; you might find as symptoms of monoxide poisoning, florid condition of the face, difficulty in breathing, dilation of the pupils, normal temperature, semi-consciousness and the fact that the patient was somewhat irrational; in his opinion the insured died from some form of heart disease or of some form of cerebral accident commonly grouped under the term of apoplexy; in the more recent literature the opinions have been clarified to about those he had stated but they still differ.

It is insisted that from the above testimony, the manifest weight of the evidence supports the second special plea, in that it proves that the insured did not die from the effects directly of carbon monoxide poisoning, but that he was afflicted with some form of heart disease and that his death was caused by the combination of that disease with the gas poisoning. We cannot agree with this contention. There is no

evidence that the insured was ever troubled with his heart and the only inference that such might have been the case were the expert opinions of the physicians who testified for appellant, but it is manifest that these opinions were not positive and at most they were but the individual opinions of those witnesses based upon the hypothetical question propounded to them. The hypothetical question has not been abstracted. Each one of the experts who testified on behalf of appellant admitted that the symptoms surrounding the illness of the insured were all symptoms of monoxide poisoning. The physician who attended him during this illness and who had been his physician for many years, stated that in his opinion the death was due directly to an acute attack of monoxide poisoning. It is argued very strenuously by counsel for appellant that the long exposure of the insured to the automobile gas emitted in the repair shop had caused heart trouble or a breakdown of the tissues of the brain, but we do not find that this theory is supported by any evidence; in fact, one of the expert witnesses for appellant testified that such an exposure would tend to make his body immune to the effects of the poisoning. Under the evidence introduced, it became a question of fact for the jury to determine whether the insured came to his death through the effects of monoxide or other poisonous gases, and there being ample evidence to sustain the verdict of the jury upon this question, this court would not be justified in holding that the second special plea was proven by the manifest weight of the evidence.

The third special plea sets out the provision in the policy which requires the beneficiary to give immediate notice of the accidental death to the insurer at its home office, 1779 Ogden Avenue, Chicago, Illinois, with particulars sufficient to identify the insured and then avers a failure to give such notice. Such a re-

quirement in insurance policies means that such a notice must be given within a reasonable length of time. What is a reasonable time must be determined from the particular facts in each particular case and must be construed with consideration of what would be the usual conduct of a beneficiary suddenly confronted by the unexpected death of the assured, and in this case by what would be reasonably expected of the widow whose husband had unexpectedly died by this accident. It would be a harsh rule of law to hold, under circumstances, that appellee should have immediately sent a notice of her husband's death to appellant. The deceased died on January 20, 1927. On January 22, appellee requested Mrs. Mary Bickus, a neighbor, to call up Mr. Lawrence L. Flynn, the general agent of appellant in Springfield, and notify him of her husband's death. Mrs. Bickus called up Mr. Flynn about 8 o'clock that morning and informed him of the death of the deceased and that it was caused by the accident. There is no dispute over this fact. Mr. Flynn immediately called the home office of appellant at Chicago on the telephone and advised them of the death and that the funeral would be held that afternoon and told them also that the inquest would be held on the following Monday, January 24. He was directed by the home office to inquire of appellee whether she expected to file a claim under the policy and that if she did, it would be necessary for her to notify the home office in writing. Mr. Flynn so notified appellee and she immediately wrote a letter to the appellant so notifying it of the death of her husband and addressed it to appellant at the address printed in the policy. It appears, however, that since the policy was issued, the home address of appellant had been changed and it did not receive this letter until January 27, 1927. Under these facts, we hold there was no unreasonable delay in notifying appellant of the death of the de-

ceased. Moreover, appellant subsequently sent to appellee mortuary blanks by which to make the proper proofs of death which she caused to be executed and returned to appellant.

The fourth special plea sets out a provision of the policy which gave to appellant the right and opportunity to make an autopsy in case of death, where not forbidden by law, and avers that a demand for an autopsy was made and refused by appellee. The proofs do not show than any demand for such an autopsy was made by appellant upon appellee until February 3, 1927, when appellant wrote to appellee making such a request. This was two weeks after the death of the insured, and after the proofs of death had been received by appellant. The proofs further show that Mr. Flynn, the general agent of appellant in Sangamon county, and Mr. Brassch, the assistant secretary and vice president of appellant and who was also an attorney at law, were present at the coroner's inquest on January 24 and no request was made at that time for an autopsy. The coroner testified that before the inquest he asked appellee if she desired an autopsy made, to which she replied in the negative. The coroner was not acting at the request of or with the knowledge of the appellant at the time he mentioned this matter to appellee and he testified that he could see no reason why an autopsy should be held. Subsequently, appellant requested the coroner to make such an autopsy under the provisions of the statute giving him authority so to do which request the coroner refused. At common law, it is a criminal offense to disinter a dead body which has been buried. Paragraph 333 of the Criminal Code, Cahill's St. ch. 38, provides as follows: "Whoever wilfully and without authority digs up, disinters, removes or conveys away from the place of sepulture or interment thereof, any human body or the remains thereof, or knowingly aids

in such disinterment, removal or conveying away, shall be imprisoned in the penitentiary, not less than one nor more than ten years.'' The general policy of the law is as stated in 13 Cyc. 271: ''Except in case of necessity, the policy of the law is that the sanctity of the grave should be maintained, and that a body once suitably buried, should remain undisturbed. . . . A proper appreciation of the duty we owe the dead, and our due regard for the feeling of our friends who survive, and the promotion of the public health and welfare, all require that the bodies of the dead should not be exhumed, except under circumstances of extreme urgency,'' and again in the same volume on page 276 it is stated: ''The beneficiary in a life insurance policy is not the only person who has an interest in having the repose of the dead respected and held sacred. It is shocking to the senses to conceive of one person or one or more persons contracting so as to provide for an exhumation and mutilation of dead bodies. We think to hold that such rights may be established by contract is carrying it to unwarranted extremes.'' Such provisions in insurance policies, however, have been recognized by the courts with certain limitations, one of which is that a demand for an autopsy must be made within a reasonable time and where there is no provision in the contract itself giving the right to an autopsy after interment, such a provision is construed to mean that such an autopsy must be demanded and performed prior to the interment. *United States Fidelity & Guaranty Co. v. Hood,* 124 Miss. 548; *Johnson v. Bankers' Mut. Cas. Ins. Co.,* 129 Minn. 18; *Massachusetts Bonding and Ins. Co. v. Duncan,* 166 Ky. 515; *American Employers' Liability Ins. Co. v. Barr,* 68 Fed. 873; *Union Cent. Life Ins. Co. v. Hollowell,* 14 Ind. App. 611; *Wehle v. U. S. Mut. Acc. Ass'n,* 153 N. Y. 116; *American Mut. Ins. Co. v. Nuckols* (Tex. Civ. App.), 187 S. W. 497. In the case of *United*

*States Fidelity & Guaranty Co. v. Hood, supra,* it was further held that if the insurer decides to avail itself of this privilege it must so arrange and provide for information to be given of the death prior to the interment. In this State, the authority for holding an autopsy is given to the coroner solely. Appellant knew of the death of the deceased early in the morning of January 22. The funeral did not take place until sometime in the afternoon of that day. No request was made for an autopsy at that time nor on the following Monday, January 24, at the time of the inquest, in fact, no demand was made for nearly two weeks later. We cannot hold that the demand for the autopsy was made within a reasonable time.

The fifth special plea is substantially the same as the second plea and need not be further discussed, and the sixth special plea is substantially the same as the fifth only in somewhat different language.

Appellant urges that the court committed an error in refusing to give instruction number 8 offered by it. This instruction, in substance, tells the jury that if they believe from the evidence that the deceased had been subject to previous attacks of carbon monoxide poisoning, and that the vital organs and tissues of his body and blood were weakened thereby, and that Cantrall contracted physical and bodily infirmities therefrom, and that the cause of his death was an acute attack of carbon monoxide poisoning superimposed upon a chronic condition, then in such case they should find the issues for the defendant. There is no evidence to justify such an instruction as we have heretofore shown; the only evidence upon this subject is that the deceased was in normal and good health up to the time of his last illness.

The ninth refused instruction offered by appellant informs the jury that if they believe from the evidence that the deceased knew of the presence of the carbon

monoxide gas in the garage and knew the dangerous effects of such gas from previous effects and attacks upon him and fully appreciated the danger of inhaling said gases, and that he remained in said workroom and continued to inhale said gases until he suffered an attack which subsequently resulted in his death, then in such case the cause of his death would not be accidental within the meaning of the policy and they should find the issues for the defendant. We know of no law to sustain such a proposition. The subtle effects of the presence of gases is seldom discovered by the person inhaling the same until they become ill therefrom. There is no evidence tending to show that the deceased knew of the presence of the carbon monoxide gas in the garage before he suffered the attack charged in the declaration.

The tenth refused instruction offered by appellant refers to the demand for an autopsy and states that if the jury believed from the evidence that the request made by such was refused by appellee then she is not entitled to recover in the case. What we have heretofore said on the subject of autopsy disposes of this alleged error.

The eleventh refused instruction tells the jury that if they believe from the evidence that death was caused directly or indirectly, wholly or partly, by bodily infirmity other than any disease, the appellee is not entitled to recover. What we have said in discussing the eighth refused instruction applies to the refusal of this instruction.

There is no error in the record and the judgment of the circuit court is affirmed.

*Affirmed.*