Suit was brought in the Circuit Court of Tunica County by the executors of the estate of Mrs. Mattee B. Myers, seeking to recover under an accident policy issued by Peerless Insurance Company to Mrs. Myers. The case was tried before the judge without a jury, and from a judgment for plaintiff, this appeal was prosecuted. The issue is whether there was enough evidence to support a finding that a trip of an hour's duration in a taxicab caused carbon monoxide poisoning of insured, which activated a latent heart condition and resulted in her death. We think there was, and thus affirm the judgment.
The insurance policy, in the amount of $25,000, had an effective period of fourteen days from and after March 1. It was purchased to insure against accident on a trip to Texas and Mexico which Mrs. Myers took. The policy stated that Peerless,
 In consideration of payment in advance of premium stated in the Schedule below, does hereby insure the person named in the Schedule against loss resulting directly and independently of all other causes from accident or bodily injury sustained during the term of this policy, subject to the conditions, limitations, and provisions hereinafter set forth.
Mrs. Myers died during the trip to Mexico, a claim under the policy was rejected, and this suit resulted.
Mrs. Myers was 71 years of age at the time of her death and a resident of Tunica County. She had been raised in Starkville, Mississippi, and had four close friends from her early years: Miss Lucy Castle, Miss Dotsy Carpenter, Mrs. Martha Wallace, and Mrs. Louise Ramsey. Mrs. Wallace resided in Texas, and in 1963, she contacted Mrs. Myers, and expressed a desire to see Mrs. Myers and her other childhood friends.
Mrs. Myers had suffered a heart attack in November 1963, and had been hospitalized under the care of Dr. P.K. Chandler. The doctor, however, permitted her to take a trip to Florida in the spring of 1964, and after an examination on February 11, 1965, he gave his permission for the trip to Texas. On or about February 16, 1965, Mrs. Myers took her car and picked up Mrs. Ramsey, Miss Carpenter and Miss Castle, and drove to Texas. A leisurely pace was set with frequent driver changes. The trip took approximately three days. After a visit in Texas with Mrs. Wallace, the ladies decided to go to Monterey, Mexico. They left Texas on March 1, 1965, and arrived in Monterey the same day. They checked into the Tarapan Hotel, and ate a "picnic" supper, which had been packed in Texas, before retiring for the night. Around two A.M., Mrs. Myers, who, in addition to her heart condition, suffered from a hiatal hernia, complained of indigestion. However, she was apparently in good health and spirits upon arising the next morning, March 2. After breakfast, they hired for the day a taxi driven by Joe Burchard Villa, for the purpose of taking a *Page 439 
tour of the city. In the latter part of the morning the ladies proceeded in Villa's taxicab to Horsetail Falls, a tourist attraction located some twenty-eight miles from Monterey, and had lunch there. This place was about 300 feet higher than the city.
The day was cool, but it became progressively colder, so after lunch in a restaurant at the falls they decided to return to Monterey rather than take a trip to the falls themselves, which were a short distance from the restaurant. Everyone was apparently feeling fine as they began the return trip in Villa's 1954 model Pontiac. All windows in the car except for a small ventilator window on the left-hand or driver's side were closed. Mrs. Ramsey sat in the middle of the front seat with Mrs. Myers to her right. Mrs. Wallace, Miss Carpenter and Miss Castle were seated in the back. The return trip from the restaurant down mountainous winding roads took between forty-five minutes and one hour, with one short stop, during which Miss Carpenter got out of the car to pick some flowers at the roadside. She returned to the car after a short time and seemed not to be feeling well. All of the ladies except Mrs. Ramsey became ill and were taken straight to another hotel in which they had reservations, rather than on a proposed shopping trip.
On reaching the hotel, Miss Carpenter got out of the taxicab and became violently ill; Miss Castle was ill; Mrs. Wallace was unable to leave the cab; Mrs. Myers walked from the taxi to a chair a short distance away, and sat down. The ladies were assisted to their room, and Mrs. Ramsey called for a doctor. Dr. J. Gonzalez Quijano, who happend to be in the hotel at the time, responded to the call for assistance, and after examining the four ladies, he administered oxygen to Mrs. Myers. An ambulance was called, but she was too ill to be moved when it arrived. She died some thirty minutes after Dr. Quijano first examined her, about two hours after the ladies arrived at the hotel.
Dr. J.L. Leiva arrived a few minutes before Mrs. Myers died, and examined her with a stethoscope, felt her pulse and took her blood pressure. He signed the death certificate, which stated that the cause of death was "appeasement of the cardiac wall as a result of generalized sclerosis of the main artery."
Appellees, plaintiffs below, alleged that the death of Mrs. Myers was the result of carbon monoxide poisoning, which triggered an otherwise latent cardiac condition. The main issues are (1) whether there was sufficient evidence to enable the trial judge sitting as the trier of facts to find that Mrs. Myers was the victim of carbon monoxide poisoning; and, if so, (2) whether she had a cardiac condition which was dormant and was reactivated by the carbon monoxide poisoning, resulting in her death.
In cases involving insurance policies which allow recovery for "loss resulting directly and independently of all other causes from accidental bodily injury," recovery may be had where the accidental injury aggravates, renders active, or sets in motion a latent or dormant pre-existing physical condition or disease, which in turn contributes to the disability or death for which recovery is sought, and where the accidental injury is a proximate cause of the resulting loss. Mutual Life Ins. Co. of New York v. Smith, 248 Miss. 448, 160 So.2d 203 (1964); United States F. G. Co. v. Smith, 249 Miss. 873, 164 So.2d 462 (1964); Mutual of Omaha Ins. Co. v. Deposit Guaranty Bank Trust Co.,246 Miss. 640, 151 So.2d 816 (1963); Metropolitan Life Ins. Co. v. Williams, 180 Miss. 894, 178 So. 477 (1938); United States F. G. Co. v. Hood, 124 Miss. 548, 87 So. 115, 15 A.L.R. 605 (1921); 1A Appleman, Insurance Law and Practice § 403 (1965); 45 C.J.S. Insurance § 776 (1946); 10 Couch on Insurance 2d § 41:79 (1962); Annot., 84 A.L.R. 2d 176 (1962); Annot., 82 A.L.R. 2d 611, 624 (1962); Cf. Standard Life Ins. Co. of the South v. Foster, 210 Miss. 242, 49 So.2d 391 (1951). *Page 440 
Moreover, death by asphyxiation from inhaling carbon monoxide gas from the exhaust of a gasoline motor is regarded as accidental, or from accidental means, if the breathing of the gas was unintentional. 29A Am.Jur. Insurance § 1279 (1960); Annot., 92 A.L.R. 164 (1934).
In determining whether the trier of facts was justified in finding for plaintiffs, we accept as true plaintiffs' evidence and reasonable inferences from it. With that rule in mind, the following is a summary of some of the evidence and inferences from it, which the trial judge was warranted in believing.
In 1963, Mrs. Myers had had an anterior infarction, but before this incident her heart condition was not active or virulent, but latent and dormant. Her general health was satisfactory.
She and the other four ladies were in good health and spirits when they finished their lunch at the Horsetail Falls Restaurant. During the one-hour trip from that point to the hotel, all of the windows in the cab were closed except the small vent on the driver's side. The weather became considerably colder. Villa, the driver was smoking cigarettes, although he denied this. Miss Carpenter got out of the cab on the way down the mountain to pick some flowers, but she only got one and reentered the cab, when she seemed "kinda dazed." Miss Carpenter said to Miss Castle, "Do you smell anything? Do your eyes burn?", to which the latter replied that her eyes did burn. Asked whether anyone complained of feeling ill on the way down, Mrs. Wallace said that she felt so bad that she didn't know everything that was said.
When the ladies arrived at the hotel, Mrs. Wallace stated she did not have the strength to stand, so someone picked her up and virtually carried her to her room. She experienced dizziness, nausea, and weakness. Miss Carpenter was quite sick, fell over a chain bordering the hotel entrance, and vomited; Mrs. Myers was sick, sitting in a chair near the driveway. Miss Castle was sick, but not as much as the others. Mrs. Ramsey did not seem to be ill. None of the ladies had any diarrhea, which ordinarily accompanies food poisoning. They were all "teetotalers," and had not drunk any intoxicating liquors. The restaurant where they ate was clean and first class. Mrs. Wallace said definitely that they did not get food poisoning. Her arms were cold, a symptom of carbon monoxide poisoning.
Mrs. Ramsey, who was sitting next to the driver on the front seat, testified that because of this location she was getting air directly in her face from the ventilator, but she did not object because she thought they needed some ventilation. Miss Carpenter complained twice about fumes in the car, after she had picked the flowers. Miss Castle inquired, "Do you smell gas?", to which Mrs. Ramsey replied that she did not, but she stated that she had the wind in her face. When the ladies got almost to town, Miss Carpenter said that she was sick, and Mrs. Myers stated, "I am as sick as I can be." Mrs. Ramsey observed that Mrs. Wallace had "passed out on the back seat with her head back." So she instructed the driver to take them straight to the hotel. When they arrived, Mrs. Myers got out and tried to walk, but just staggered to a chair by the door. Miss Carpenter got out and vomited. Mrs. Wallace was unable to get out of the car being "still passed out." Miss Castle was sick also. Mrs. Ramsey ran in the hotel and told the clerk at the desk to get a doctor as quickly as possible, "I believe that we have carbon monoxide poisoning." Five or six men came out and helped or virtually carried the ladies to their hotel room. She did not remember the skin coloring of any of the women except Miss Carpenter, whose face was very red. This is sometimes indicative of carbon monoxide poisoning
After Dr. Quijano arrived and tried to give Mrs. Myers oxygen, she resisted, saying *Page 441 
"I just can't get my breath." Dr. Quijano arrived at the hotel room about an hour after they got there. Four of the women were quite sick, dazed, and not reacting normally. They had nausea and appeared to be intoxicated or poisoned. Mrs. Myers had some dypsnea, or difficulty in breathing. Her blood pressure was below normal, and her pulse rapid, and she had bronchial secretions and rales. Her respiration was fast and shallow. Although Dr. Quijano had some difficulty in distinguishing between possibility and probability, he finally stated that in his opinion these four women were probably suffering from carbon monoxide poisoning. Since carbon monoxide has a direct impact on red blood cells, it is more dangerous to a person who has previously had a heart attack.
Dr. Leiva arrived only a few minutes before Mrs. Myers died. Her blood pressure was low, her heart sound slow, and she was pale and pallid, with difficulty in breathing. One of her friends told him that she had had a previous heart attack, so the death certificate stated a heart attack as the cause of death. Dr. Leiva said that did not rule out carbon monoxide poisoning as having produced the attack.
Dr. Ira B. Bright, on hypothetical question, was of the opinion that Mrs. Meyers was ill from carbon monoxide, which triggered the heart condition that caused her death. He did not think that food poisoning was involved. On the other hand, Dr. Robert Ray McGee, a witness for defendant on a hypothetical question, was of the opinion that the most probable cause of death was arteriosclerotic heart disease. A pathologist stated that he could not establish a diagnosis of the cause of death, but the symptoms were those of a cardiac failure of some sort.
An affidavit of the cab driver, Villa, was admitted in evidence by stipulation. He stated that the weather began to get cooler and the front left window and vent were open. Mrs. Wallace and Mrs. Ramsey testified to the contrary, that only the left front vent was open. He said that he did not remember whether any of the women complained to him about feeling bad, but here again he is contradicted by both of those who testified. And almost incredibly, he said that when the ladies left his taxi at the hotel, he did not know that any of them were ill. He thought that the car was in good mechanical condition and did not notice any fumes coming into it. He said he was not smoking, although the ladies testified to the contrary. Because of material contradictions of his testimony, the trial judge was justified in rejecting Villa's statement that his car was in good mechanical condition and there were no fumes.
After careful consideration of the record, we conclude that the trial judge was justified in rendering judgment for plaintiffs. There is no explicit evidence that the atmosphere in the taxicab during the trip down the mountain to the hotel was impregnated with carbon monoxide; nor that the condition of the vehicle caused it to emit carbon monoxide into its interior. The availability of specific evidence of this nature would be rare. However, all of the facts and circumstances point toward carbon monoxide poisoning. The eyes of the ladies were "burning" and they noticed "fumes" on the trip down from the restaurant. Four of the five became acutely ill on this trip. The only occupants of the cab who did not become sick were the driver and Mrs. Ramsey, both sitting close to the ventilation. Four of the women were badly affected by some common cause.
Dr. Quijano, who treated them, thought it was "intoxication," or some type of poisoning, and probably carbon monoxide poisoning. The symptoms of Mrs. Myers and the other women were substantially those of carbon monoxide poisoning. The common cause that affected these ladies occurred during the trip from the restaurant down the mountain to the hotel. By *Page 442 
that time, several of them were very ill, and Mrs. Myers died shortly thereafter. The trial court could conclude that food poisoning was not involved. Other possibilities as to the cause of the common illness, which began and became intense during the trip down the mountain, are excluded. The testimony of Mrs. Wallace and Mrs. Ramsey and that of Dr. Quijano were sufficient to support a finding that Mrs. Myers received an accidental injury, carbon monoxide poisoning, which in turn activated a latent and dormant heart condition and caused her death. This was an issue for the trier of facts.
In Police Fireman's Insurance Association v. Mullins,260 Ala. 173, 69 So.2d 261 (1953), the insured under an accidental death policy went to his basement to fix a coalfired furnace. The house and basement were filled with smoke. Insured apparently had a pre-existing atherosclerosis. Two of his dogs that were in the basement became sick, and one died. Insured died early the next morning. The court held that whether insured's death was caused by carbon monoxide poisoning, and whether it activated a pre-existing atherosclerotic condition, were questions of fact for the jury. Cantrall v. Great American Casualty Co., 256 Ill. App. 47
(1930), involved the death of a garage employee from inhaling the exhaust of running motors, and, apparently, from a preexisting heart condition. Judgment for the insured on an accident policy was affirmed. Cf. Ocean Acc. Guar. Corp., Limited v. Schachner, 70 F.2d 28 (7th Cir. 1934).
Affirmed.
JONES, BRADY, PATTERSON and SMITH, JJ., concur. *Page 686