STANDARD LIFE INS. CO. *v.* FOSTER.

Division A.   Dec. 11, 1950.

No. 37724  (49 So. (2d) 391)

Brandon, Brandon, Hornsby & Handy, for appellant.

244

**W. A. Geisenberger,** for appellee.

246

**McGehee, C'. J.**

Amos Foster, the husband of the plaintiff Victoria Foster, was insured at the time of his death for the sum of $1,000 payable in such event to his wife as beneficiary under the provisions of an industrial limited accident policy issued to the insured by the defendant, Standard Life Insurance Company of the South. The policy recites that the insurance company "hereby insures the person named in the policy against the result of bodily injuries received during the time this policy is in force, and effected solely by external violent and accidental means . . .".

The bodily injuries above referred to had to be caused in the instant case by the insured being struck by a

vehicle propelled by gasoline, and his death had to be the proximate result of the bodily injuries so received solely by such external violent and accidental means.

It was shown on behalf of the plaintiff, and there was no substantial contradiction thereof, that the insured Amos Foster sustained severe bodily injuries, consisting of "fracture dislocation ankle" and "multiple rib fractures" on November 18, 1948, while the policy was in force, when he was struck by a motor vehicle driven by one Waggoner on the streets of Natchez, at a time the insured was about his duties as a street sweeper on the evening of that day. That the insured remained in the hospital continuously from the time of his injuries until his death on December 1, 1948.

The principal issue presented to the jury for decision was whether the death of the insured was the proximate result of the bodily injuries thus sustained, or whether his death was due to an attack of epilepsy; also he is alleged to have suffered from such an attack on both the 19th and 20th of November 1948. The attending physician testified that he was not present when either of the attacks of epilepsy occurred, but that he was informed thereof by some attendant or nurse, and was told by some member or members of the family that the insured had previously suffered from some kind of "spells", mentioning only the insured's wife in particular who had given him any information in regard thereto, and he stated that he thought when he talked to the wife of the insured "she implied that it was some spell other than convulsive seizure" that he may have had in the past.

Two of the attacks of epilepsy which were shown by entries on the hospital record in the handwriting of the attending physician were alleged to have occurred on November 19 and on December 1, 1948. But there was no direct proof of the insured having had epilepsy, except that on December 4, 1948, a statement in writing was procured from the plaintiff wherein she stated that Dr.

Rucker (a colored physician) had "treated Amos for nervous spells in 1946 and Amos had not had one of these spells for some time." The statement further recited that: "I kept medicine to give Amos when he had one of these spells. . . . Amos did not go out of his head when he had one of these spells. He would get awfully weak and would go to sleep. When Amos waked up he would be all right. Amos had not had one of these weak spells since last year. . . . Amos had not been treated by a physician since last year for anything. I have not had to give Amos any V 4 or of this nerve medicine this year."

However, the plaintiff testified upon the trial that she was at the hospital on the morning of November 19th when the insured is alleged to have had the first convulsion there and that she did not know anything about it, and she was asked "Did you ever tell anybody he had ever had a convulsion? A. No, sir. Q. Or a fit? A. Nothing about no fit. Q. Did you ever know of him having one? A. No, sir." On that morning, the insured had a cast on his leg and Victoria said that both Amos and the doctor told her that "his ribs were crushed." She further testified that she had never seen Amos have any sort of a spell, and that he had been working every day for the city for many years prior to being struck by Mr. Waggoner's automobile.

The attending physician, Dr. Butler, gave a certificate to the State Bureau of Vital Statistics in which he stated that the insured had a "fracture dislocation left ankle" and "multiple rib fracture" on the left side, and under the head of "major findings" therein he stated "sustained by being struck by a motor truck on street of Natchez while pushing a cleaning cart." This certificate further stated that the death was "not due to external causes." The certificate was filed as an exhibit to the answer of the insurance company, and as constituting prima facie proof of the facts therein stated, when this suit was brought by the beneficiary to recover the insurance.

It is assigned as error here that the trial court permitted the laboratory technician at the hospital to identify the hospital record partly in the handwriting of Dr. Butler, the attending physician, and which disclosed that after the insured had been carried to the hospital on the night of November 18th, he had a convulsion early the next morning, the same morning that his wife visited the hospital, as hereinbefore stated, and another convulsion on the morning of December 1st, when he died, and which hospital record failed to show that a blood chemistry had been done on the patient. This testimony was objected to as hearsay and it was contended that the attending physician was available as a witness and could testify instead. However, the defendant insurance company introduced the attending physician later, and he either admitted or failed to contradict the facts stated in the hospital record, and did not testify that a blood chemistry had in fact been done on the patient.

The admission of incompetent evidence is not available as error on appeal when the appellant, on his own behalf, introduces evidence which admits, confesses, or otherwise sufficiently establishes the facts sought to be shown by the incompetent evidence. Ruffin v. Schwabacher, 156 Miss. 326, 126 So. 14; 4 C. J. 969, 979, 5 C. J. S., Appeal and Error, Section 1724, Section 1732; State v. Furney, 41 Kan. 115, 21 P. 213; McCracken v. Robison, 2 Cir., 57 F. 375.

It is also contended that it was error to permit Dr. Rice to testify in the manner in which he did as an expert for the plaintiff for the reason that the questions asked him were for the purpose of impeaching the testimony of the attending physician before the latter had been introduced as a witness and any predicate had been laid for that purpose. However, the objection was not made on that ground at the trial, but upon the ground that the questions were not sufficiently hypothetical, and the objection also seems to have been made on the ground that it assumed that no blood chemistry had been done on the

patient without proof of that fact having been made except by hearsay evidence. But, we think that the questions were sufficiently hypothetical, and that it was not reversible error for the plaintiff to be allowed to prove by the laboratory technician that no blood chemistry had been done on the patient, and to prove by Dr. Rice that the death of the insured was the proximate result of the bodily injuries sustained when he was struck by the motor vehicle, all in anticipation of the introduction of the certificate of the attending physician as to the cause of the death where such certificate had been made an exhibit to the answer of the insurance company and which the defendant was relying on as constituting prima facie evidence of the facts therein stated, and especially is this true where the attending physician was later introduced as a witness and testified for the defendant as to all of the facts as being true which were stated in the hospital record and assumed in the questions asked Dr. Rice. Under the authorities cited in the preceding paragraph, the error, if any, was thereby cured.

It was the opinion of Dr. Rice that one may "have convulsions from shocks of different kinds, . . . a patient who has damaged blood vessels, even though it is in the foot, and certainly in the abdominal region or chest where sympathetic nerves are involved and sympathetic nervous system, (they) will set up convulsions of the epilepsy type . . . and the whole thing could arise from the injuries with no so-called epilepsy being involved whatever." He was then asked if that possibility could be eliminated without a blood chemistry and he answered "No, I don't think it could." He further testified that the fractured ankle in connection with the fractured ribs could cause convulsions; that "unless I had an exclusive diagnosis by the procedure that I mentioned, spinal puncture, blood chemistry, a check from the start to finish, followed by a blood chemistry, unless I had that kind of check against the possibility of an epileptic convulsion, I would say the man's convulsions

were due to his injuries, that would be logical, I would have to say that.''

While the attending physician was of the opinion that the immediate cause of the death was epilepsy, and that it was ''not due to external causes,'' he was asked ''Doctor, was the injury to Amos Foster sufficient to cause death in this case?' A. No one can answer that question. I have known of death resulting from one large bone broken and a person apparently healthy.'' He frankly admitted that his opinion as to the immediate cause of death was based upon what someone else had told him, and that he had never seen the patient until after the occasion of his accident, and that he thought when he talked to the wife of the insured that ''she implied that it was some spell other than convulsive seizure'' that he may have had in the past. In addition to describing the multiple rib fractures, this witness stated that ''the appearance of his leg is very easily described. His leg was sitting over on the instep of his foot with too much heel behind. That describes it simply. Q. Pushed out? A. Pushed forward.'' This attending physician further stated that ''He was found to have tenderness over the region of one thorax, I believe the left; extreme pain or pressure over one thorax, one side, I believe the left. Q. Is that in the chest region?' A. It is in the chest region. . . .''

Therefore, under the foregoing testimony we are of the opinion that it was a question for the jury as to whether or not the death of the insured was the proximate result of *bodily injuries*, which were effected solely by external violent and accidental means. In fact, there could be no question but that the bodily injuries were received and effected solely by external violent and accidental means, ██ █ and if there is any doubt as to whether the provision of the policy means that the bodily injuries must be effected solely by external violent and accidental means, instead of meaning that the *death* must be effected solely by such means, then the doubt would have to be

resolved in favor of the insured, since Section 5681, Code of 1942, renders unenforceable in favor of the insurer "any contract of insurance or agreement as to such contracts other than are plainly expressed in the application and policy issued thereon; . . . .".

In the case of U. S. Fidelity & Guaranty Company v. Hood, 124 Miss. 548, 87 So. 115, 15 A. L. R. 605, the insurance was against "the effects resulting directly and exclusively of all other causes from bodily injury sustained during the life of this policy solely through accidental means". Therefore, the provisions of the two policies are not the same, since the provision of the policy was more favorable to the insurance company in that case for the reason the death had to be due *exclusively* of all other considerations to *bodily injury* sustained *solely* through accidental means, instead of merely requiring that the *bodily injuries* should be effected solely through such means. But, even in that case the Court held that "We think that, if the accident is the proximate cause of the death and sets in motion or starts a latent or dormant disease, and such disease merely contributes to the death after being so precipitated by the accident, it is not a proximate cause of the death nor a contributing cause within the meaning of the terms of the policy." The Court further stated therein that: "It is not sufficient to defeat the policy that the accident may have made some latent disease active, which disease contributed in some degree to the death. If the disease was active and of such character and virulence as to endanger life apart from the accident, but might not have done so had the accident not happened, then that may be said to be a proximate contributing cause."

In the instant case, the proof is undisputed that prior to the accident in question there had been nothing wrong with Amos Foster throughout the year in which he died on December 1, 1948. In other words, the disease, if any, was not "active and of such character and virulence as to endanger the life apart from the accident." In

fact, Dr. Rice testified that "there is no disease of epilepsy," that it is a matter of symptoms and is the result of something else. Moreover, he stated that "I would say that very few doctors have ever seen anybody die from epilepsy."

The insurance clause involved in the cases of U. S. Casualty Company of N. Y. v. Malone, 126 Miss. 73, 87 So. 896; Metropolitan Life Insurance Company v. Williams, 180 Miss. 894, 178 So. 477; and Equitable Life Assurance Society of U. S v. Askew, 194 Miss. 347, 11 So. (2d) 441 appear to differ in verbiage, and somewhat in meaning, from that involved in the instant case in that in the Malone case if the death is contributed to, directly or indirectly, wholly or partly, by disease, it is not covered by the policy; in the Williams case the contingency insured against is death caused *directly* and *independently* of any other cause than by violent and accidental means, whereas in the instant case it seems that the insurance clause only requires that the bodily injuries shall be received and effected solely by external violent and accidental means and that the death must occur as a proximate result thereof; and in the Askew case the insurance clause was to the same effect as in the Williams case.

The case was submitted to the jury under instructions, both on behalf of the plaintiff and defendant, to the effect that the death need be only the proximate result of bodily injuries, which injuries must have been received while the policy was in force and effected solely by external violent and accidental means. The court instructed the jury for the plaintiff that: "if you believe from a preponderance of the evidence in this case that the deceased Amos Foster (Amos Forster) was struck by actually coming into contact with any part of the motor truck of the witness Waggonner, and thereby received injuries which proximately caused his death, you shall find a verdict for the plaintiff in the full amount

sued for, to-wit: $1,000.00 with interest at the rate of 6% per annum from March 1, 1949."

And the court instructed the jury further that: "if you believe from a preponderance of the evidence that the deceased Amos Foster sustained a fracture dislocation of his left ankle or fracture of his 5th, 6th, and 7th ribs on his left side by coming into actual contact with any part of the motor truck of the witness Waggonner, and that such injuries were the proximate cause of his death, then such injuries were effected solely by external, violent and accidental means, and you shall find a verdict for the plaintiff, even though you may further believe that Amos Foster also came in contact with the cart which he was pushing at the time."

And the defendant obtained an instruction reading, in part, as follows: "You are further instructed that unless you are satisfied by a preponderance of the evidence that Amos Foster died as the proximate result of bodily injuries received and effected solely by external, violent and accidental means, strictly in the manner set forth in the insurance policy herein sued on, your verdict shall be for the defendant, and this is true even though you may believe from the evidence that the vehicle driven by Waggonner came in contact with the deceased, if at the same time a preponderance of the credible evidence fails to satisfy your minds that such contact was the proximate cause of the injuries and death of Amos Foster."

Another instruction substantially to the same effect was refused to the defendant, but we are of the opinion that the instructions that were given when taken as a whole had the effect of fairly presenting the issue to the jury for decision, and we are unable to say that the verdict was against the weight of the evidence, or that any error was committed on the trial that would justify reversal of the case.

Affirmed.