**Edna Talley ENGLISH, Plaintiff,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, Defendant.**

**No. EC6398.**

United States District Court
N. D. Mississippi, E. D.
June 26, 1967.

Burgin & Gholson, Columbus, Miss., Harvey S. Buck, West Point, Miss., for plaintiff.

Threadgill & Hicks, Columbus, Miss., Watkins & Eager, Jackson, Miss., for defendant.

## OPINION

CLAYTON, Chief Judge.

This case originated when Mrs. Edna Talley English, plaintiff, filed her declaration against defendant, Insurance Company of North America, in the Circuit Court of Clay County, Mississippi, seeking to recover $50,000.00 as the named beneficiary with respect to a certificate of insurance issued by defendant on the life of Elbert W. English, her deceased husband. The case was removed by defendant to this court on the basis of diversity. After removal and before a responsive pleading by defendant had been served, the declaration was amended by exhibiting a copy of insurance policy No. SGA–402, issued by defendant and referred to in the original declaration. In due course, defendant answered and the case was tried to a jury with a verdict for plaintiff, upon which judgment was entered for her in the amount sued for.

At the close of all the evidence, defendant moved for a directed verdict upon specific grounds, and the court reserved ruling under the provisions of Rule 50(b), Federal Rules of Civil Procedure. After the jury verdict and entry of judgment thereon, defendant filed a timely motion to have the verdict and judgment set aside and for judgment in accordance with the motion for a directed verdict and, alternatively, for a new trial. Rules 50 and 59, Federal Rules of Civil Procedure. That motion is now for disposition on briefs of the parties.

The policy in suit insured " * * * against loss resulting directly and independently of all other causes from bodily injuries caused by accident * * * "

### I.

Defendant contends that this controversy is governed by the law of Tennessee, while plaintiff contends that Mississippi law controls. This issue stands at the threshold and must be dealt with first.

The contract is a group policy between defendant, a Pennsylvania corporation, and the Tennessee Valley Authority, with a certificate issued thereon to Mr. English. The record is silent as to where the group policy was executed and delivered, but the record does clearly show that Mr. English moved directly from Kentucky to Mississippi and became a resident of Clay County, Mississippi, before he began to work as an employee of the Tennessee Valley Authority, and that never, after becoming such an employee, did he reside at any place other than Clay County, Mississippi. He was a resident there at the time of his death. At the time of the application for insurance, he was an employee of the Tennessee Valley Authority with a payroll number, and this status continued until his death. He paid all of the premiums and these facts, with the relevant specific language of the master policy itself, bring the question of which law applies into proper focus. The applicable language of the master policy is:

Any provision of this policy which, on its effective date, is in conflict with the statutes of the state *in which the insured resides on such date,* is hereby amended to conform to the minimum requirements of such statutes.

No action shall be brought after the expiration of three years (or the minimum time, if more than three years, permitted by law *in the state where the insured resides*). (Emphasis added.)

Mr. English was a resident of Mississippi at the effective date of the policy and so remained continuously until his death.

██ . The proper principle to be applied in determining which state law governs the construction of this policy is well stated in 16 Am.Jur.2d, Conflict of Laws, § 41, as follows:

* * * The true test for the determination of the proper law of a contract is the intent of the parties and that this intent, whether express or implied, will be given effect except under circumstances evincing a purpose in making the contract to commit a fraud on the law. In other words, the

proper law of the contract is that which the parties intended or may fairly be presumed to have intended. Under this rule, the place where the contract is made and the place where it is to be performed are both important indicia of the law by which the parties may fairly be presumed to have intended that the contract should be governed, but neither is necessarily conclusive.

This principle has been recognized and applied by the United States Supreme Court in such cases as Gaston, Williams & Wigmore of Canada, Ltd., v. Warner, 260 U.S. 201, 43 S.Ct. 18, 67 L.Ed. 210 (1922); Pinney v. Nelson, 183 U.S. 144, 22 S.Ct. 52, 46 L.Ed. 125 (1901), and The Majestic, 166 U.S. 375, 17 S.Ct. 597, 41 L.Ed. 1039 (1897), and others. It has been followed in Mississippi e. g., Castelman v. Canal Bank & Trust Company, 171 Miss. 291, 156 So. 648 (1934) and Greenlee v. Hardin, 157 Miss. 229, 127 So. 777, 71 A.L.R. 741 (1930). It has also been expressed as the rule with respect to conflict of laws in Tennessee. See First National Bank v. Shaw, 109 Tenn. 237, 70 S.W. 807, 59 L.R.A. 498 (1902).

 The quoted language from the policy clearly indicates the intention of the contracting insurance company to have the construction of the contract varied in accordancce with the laws of the state in which the respective insureds should reside. This, coupled with the universally applied rule (which needs no citation of authority to sustain) that since the policy or contract was prepared by the insurance company, it must be strictly construed against defendant, makes it clear, in the light of the undisputed facts here, that the law of Mississippi should and does control.

Cases cited by defendant such as Protective Life Insurance Company v. Lamarque, 180 Miss. 243, 177 So. 15 (1937) and Hartford Accident and Indemnity Company v. Delta and Pine Land Company, 169 Miss. 196, 150 So. 205, reversed, 292 U.S. 143, 54 S.Ct. 634, 78 L.Ed. 1178 (1933), are inapposite and are readily distinguishable on their facts. In *Protective Life,* Lamarque, the insured, had no contractual relationship with the insurance company, but was a third-party beneficiary of the contract which was between Alabama Power Company and the insurance company. Moreover, the insurance company was an Alabama company and wrote the policy for the power company in Birmingham, Alabama, and the policy made all effective dates, proofs, privileges and provisions to be performed in Alabama and subject to Alabama law. All premiums were paid by Alabama Power Company and none were paid by Lamarque. In *Hartford Accident,* the United States Supreme Court held that Mississippi law did not apply because the plaintiff had its principal office in Memphis, Tennessee (although it was doing business in Mississippi); an agent of plaintiff in Memphis contacted the Memphis office of the insurance company and there contracted for the fidelity bond coverage, and the contract was written and delivered in Tennessee and under its language was to be performed in Tennessee and construed under the law of that state.

II.

Elbert W. English, the insured, whose death gave rise to this suit, was employed during his lifetime, at a Tennessee Valley Authority power transmission substation which was located in the outskirts of West Point, Mississippi. He was one of two substation operators assigned to this substation. Each of these operators worked alone and when so working had the sole responsibility of conducting switching operations under directions therefor which were issued to them by a dispatcher for the Tennessee Valley Authority operating from Muscle Shoals, Alabama. These instructions were issued by voice over one of several means of communication. The object of such switching operations was to change, divert and reroute the flow through power transmission lines of electric power of extremely high voltages.

On the night of October 22–23, 1962, Elbert W. English was on duty and was

engaged in carrying out switching instructions which had just come to him from the dispatcher. To carry out these instructions, it was necessary for him to manually operate a series of switches in the sequence prescribed by his instructions, but this he did not do. He made a switching error which left a tremendous amount of power with no place to go. This power arced upward and across the equipment with a tremendous flash of light. This phenomenon was seen by witnesses as much as three miles away. They described it as "a tremendous flash of light over the northwest section of West Point" and as "a hugh flash of light in the vicinity of the substation which lit up the whole sky," and as being "like lightning, just overhead." This arcing power damaged and destroyed a substantial amount of equipment in this substation and threw pieces of insulators as far as 50 feet away from the place where the arc began.

The dispatcher at Muscle Shoals immediately noticed that something was wrong at this substation when a heavy surge of power occurred on the distribution system which had the effect of blocking out some of its principal high power lines. He tried without success to reach English over the several communications systems available from 5:19 a. m. to 5:26 a. m. He did reach English at 5:26 a. m. and testified that at that time English was in a dazed condition, but coherent. English reported that he had made an operating mistake and then gave to the dispatcher information about the conditions which then existed at the substation, most of which was correct, but he did give some wrong figures. English was then given some additional instructions by the dispatcher which he started carrying out.

The other substation operator who had been alerted by telephone arrived at the substation at about 5:30 a. m. and immediately checked all of the dials and instruments on the board or panel which was inside the building, noticing some irregularities. He called the Muscle Shoals dispatcher on the telephone and was talking to him when English came into the building and said to him, "Isn't this ridiculous. Sorry this happened to me." And was told, "Forget it."

The dispatcher gave this other operator some inspection instructions and then asked to talk to English. English took the phone as the other operator went out into the station. During that telephone conversation with the dispatcher, English seemed coherent and confirmed his previously expressed opinion as to the nature of the switching error made by him. He was asked to check on some of the panels in the building and left the phone. When the other operator was about six feet from the board where the telephone was located, he heard a noise which sounded like a clipboard hitting the floor and when he came back to the control room, he found English on the floor lying on his back with the telephone on his upper left chest, with its cord across his mouth. His only movement was that his lips were quivering. The other operator removed the phone and checked to try to locate a pulse on English, but could find none. He immediately reported this to the dispatcher and then telephoned for a doctor and an ambulance. English was dead before the doctor arrived. The only outward mark on his body was that his eyebrows were singed.

It is patent that an arc, such as aforementioned, did occur immediately in front of English as a result of his switching error, which produced a tremendous flash of light and a very loud noise. It caused molten copper to drip with crackling noises all about and created a continuing series of loud reports upon each flash of power to steel. Such an occurrence in close proximity is calculated to produce in any human being a high degree of excitement and fear.

### III.

An autopsy was performed, and the pathologist who did this was a witness at the trial. A written report of his find-

ings was also introduced as an exhibit.[1] In sum, he found that Mr. English had a severe case of atherosclerosis. He found a clot or thrombus which had completely occluded the left circumflex coronary artery. It was his opinion that this clot and the resulting occlusion was the immediate cause of death.

Other medical witnesses testified, including general practitioners, internists and cardiologists. The pathologist also testified with respect to the relationship between the switching error aforementioned and the phenomena following it and the death of Mr. English.

It is without dispute in the record of this case that Elbert English was not aware that he had coronary artery disease of any sort. From the time of his first employment by the Tennessee Valley Authority and until his death, he had undergone two medical examinations. These were routine procedures occasioned by his employment and were complete, general examinations. The examining physician found the cardio-vascular system to be normal. In 1959, he had surgery for gallstones. He had no complaints of any sort after this operation. Except for that one period in 1959, he lost no time from his work because of illness.

### IV.

A statement of the essence of the conflicting opinions of the medical witnesses will demonstrate issues of fact pertinent under the case law of Mississippi.[2]

The pathologist was of the opinion that the switching error and the resulting fright and stress was probably a major factor in the formation of the clot and, thus, in the death of English. He referred to it as the "precipitating" cause of death. It was his opinion that the clot could have been formed during the time which elapsed after the accident and before death. He felt that the clot was formed before death. He also testified that the atherosclerosis was active, that it was a constant threat to life and that it was amazing that English had lived so long. It was his view that the pre-existing condition and the emotional stress both contributed to the death. He also stated that all atherosclerosis is progressive, with the rate of progress being variable from person to person.

A highly qualified internist and cardiologist testified that English died of a heart attack which was precipitated by the accident and that he would have lived on except for the occurrence. It was his opinion that ventricular fibrillation was produced by the stress and that this caused the death. It was also his view that there is no way to know whether the clot formed before or after death; that the clot could have caused death, but, that death could have resulted from the increased demand for blood at the time of the severe stress, causing a narrowing of the vessels and, thus, a cutting off of blood to the heart.

The general practitioner, who was called to the substation and examined English after the occurrence, expressed the opinion that "the man was scared to death" and that he died of a heart attack which was precipitated by fright. He testified that the disease was dormant (which he defined as "not manifest to the patient") and that except for the accident he might well be still living. It was his view that the clot could have formed within a few minutes and that its formation probably was caused by the emotional stress.

All three of these medical witnesses for the plaintiff were of the opinion that the accident was probably the direct or precipitating cause of death. Two of them went further and stated that, in

---

1. This report had been used by some of the medical witnesses in connection with preparation for their testimony or in connection with a deposition.

2. One general practitioner testified only with respect to the routine general phys-

ical examinations aforementioned. He expressed no opinion about the cause of death.

their opinion, it was in fact the direct cause of death.

A qualified cardiologist testified for defendant that he had no doubt but that the clot was formed before death; that the atherosclerosis was extensive and progressive; that it was not latent and could have caused death at any moment. He stated that English lived in constant danger of death and that, in his opinion, the cause of death was the coronary thrombosis which had no causal connection with the arcing caused by the switching error. It was his view that the death was coincidental to and not caused by the phenomena resulting from the switching error. In many areas, he expressed opinions which were directly contrary to those expressed by other medical witnesses.

None of these witnesses testified that atherosclerosis was the cause of death.

### V.

This court is *Erie*[3] bound to apply the law as it has been developed by the Supreme Court of Mississippi. The landmark decision which laid down the principles applicable here is the case of United States Fidelity and Guaranty Company v. Hood, 124 Miss. 548, 87 So. 115, 15 A.L.R. 605 (1921). It involved the death of a 56-year old man who fell in his yard on December 12, 1917, striking the back of his head.[4] He was taken to a hospital on December 19 where he died on December 27. The medical evidence showed that before the fall the assured suffered from high blood pressure, kidney trouble, uremia, arteriosclerosis, chronic intestinal nephritis and, perhaps, organic heart disease. Two physicians testified that, in their opinion, the fall precipitated, aggravated or accelerated his death from the diseases, and two others testified that there was little or no connection between the fall and the death, which occurred fourteen days later. The Supreme Court held that this was a jury issue un-der the policy which insured against death "resulting directly and exclusively of all other causes from bodily injury sustained * * * solely through accidental means". In so deciding, the court, inter alia, said:

> We think that, if the accident is the proximate cause of the death and sets in motion or starts a latent or dormant disease, and such disease merely contributes to the death after being so precipitated by the accident, it is not a proximate cause of the death nor a contributing cause within the meaning of the terms of the policy.
>
> * * * * * *
>
> * * * It is not sufficient to defeat the policy that the accident may have made some latent disease active, which disease contributed in some degree to the death. If the disease was active and of such character and virulence as to endanger life apart from the accident, but might not have done so had the accident not happened, then that may be said to be a proximate contributing cause. The court ought not to construe a contract so as to defeat rather than promote the purpose of the party in taking out the insurance.
>
> * * *

This language and more from *Hood* was quoted with approval in Metropolitan Life Insurance Company v. Williams, 180 Miss. 894, 178 So. 477 (1938), in which the court affirmed a verdict and judgment for the plaintiff for the death of a blacksmith who sustained a minor injury to his hand. Before this injury, he had suffered from diabetes. Apparently, the insured died from septicemia, but the certificate of the attending physician stated that diabetes was a contributory or secondary cause of death, and, in effect that the duration of the cause of death, from the personal knowledge of the attending physician, was two years by which, the court said, "He evidently meant that he had known of the patient's diabetic condition for a period of two years, since

---

3. Erie Railroad Company v. Thompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

4. It is to be noted that nothing is said in the report about any external evidence of trauma.

that which he gave as the principal cause of death had been of only a few weeks' duration at the time he gave the certificate." There was medical evidence which the court held warranted the jury in believing that the injury was the predominant and efficient proximate cause of the insured's death. After quoting from *Hood,* the court said further:

> We are of the opinion that it was a question for the jury under all the facts and circumstances to determine both the question as to whether the injury was caused by accidental means and as to whether death resulted from the injury directly and independently of all other causes * * *.

The policy in *Williams* insured against death "from bodily injury caused directly and independently of all other causes by violent and accidental means * * * "

The essential facts in Equitable Life Assurance Society of U. S. v. Askew, 194 Miss. 347, 11 So.2d 441 (1943), were that the policy provisions which were in issue were that the death must have "resulted solely from bodily injuries caused directly, exclusively and independently of all other causes by external, violent and purely accidental means". The court stated the facts in this way:

> The evidence discloses * * * that in 1936 a ruptured brain blood vessel resulted in the insured's having a stroke of apoplexy, and being paralyzed on his right side, from which he became permanently disabled and since which to his death the appellant made him payments under the total disability clauses in the policy. After this stroke the insured's physical condition grew worse and he suffered and was suffering at the time of his fall with hardening of the arteries, high bood pressure and a valvular heart disease from which his death might be expected at any moment. *What the immediate cause of his death was does not appear.* (Emphasis added.)

The evidence showed, and all it did show, to support plaintiff's claim that this was a death covered by the provisions of the policy, was that the insured fell on May 26, 1941, breaking his hip, and died on July 5, 1941. *There was no medical evidence to support the view that the fall had anything at all to do with the death.* The court reversed a judgment for plaintiff and entered judgment for the insurance society, saying:

> Had the evidence disclosed that the insured was suffering with a latent disease which was put actively in motion by the breaking of his hip, *a different question would have been presented.* (Citing Hood, supra.) (Emphasis added.)

The policy provisions with which the court was concerned in Standard Life Insurance Company of the South v. Foster, 210 Miss. 242, 49 So.2d 391 (1950), were that the company "hereby insures * * * against the result of bodily injuries * * * effected solely by external, violent and accidental means * * * ". In the opinion there appears this language:

> The bodily injuries above referred to had to be caused in the instant case by the insured being struck by a vehicle propelled by gasoline, and his death had to be the proximate result of the bodily injuries so received solely by such external violent and accidental means.

The insured sustained severe bodily injuries, consisting of "fractured dislocation ankle" and "multiple rib fractures" on November 18, 1948, and remained in the hospital from the time of his injuries until his death on December 1, 1948. The medical evidence was conflicting with that for the plaintiff tending to show that the death resulted from the injuries and that for defendant tending to show that the death was caused by epilepsy. A verdict and judgment for plaintiff was affirmed. *Hood* was cited with approval, although the language of the two insuring clauses was distinguished.

The insuring clause was for death by accident "independently and exclusively of disease and other causes", in the case of Mutual of Omaha Insurance Company v. Deposit Guaranty Bank and Trust Company, 246 Miss. 640, 151 So.2d 816 (1963), and the facts there were quite

different from the facts with which we are concerned here. Dr. Sharon, the insured, was in an automobile-train accident on December 31, 1961, and died soon thereafter. Even plaintiff's most favorable medical witnesses conceded that the injuries caused by the collision *were not of themselves sufficient to cause death,* independent of a long existing heart condition. In speaking of the facts, the court said:

> All of these expert witnesses * * * agreed that the active virulent heart disease was a proximate cause of insured's death. * * * In other words, the most that the medical witnesses for the plaintiff would say *was that the accident contributed to the insured's death.* But it is to be noted that the insuring clause of the policy * * * required the insurance company to pay the death benefits only where the death occurred through 'accidental means * * * independently and exclusively of disease and all other causes'. (Emphasis added.) Therefore the proof in the case on behalf of the plaintiff was insufficient to bring this claim within the said provision of the policy.

A judgment for plaintiff was reversed, and judgment was rendered for the insurance company.

With one slight exception, the facts in Mutual Life Insurance Company of New York v. Mrs. Leone L. Smith, 248 Miss. 448, 160 So.2d 203 (1964), are strikingly similar to the facts in the case which is now here. The double indemnity portion of the policy there in suit insured against death "as a direct result of bodily injury effected solely through external, violent, and accidental means, independently and exclusively of all other causes, and of which, except in the case of drowning or asphyxiation, there is *evidence by a visible contusion or wound on the exterior of the body* * * *." (Emphasis added.)

The insured was involved in an automobile accident on September 18, 1962, and it was conceded by defendant that there was some discoloration of the insured's abdomen and shoulder, and the evidence showed that there was a blue spot four or five inches long and two or three inches wide on his lower chest and abdomen. He died a few days later with a ruptured aortic aneurysm. The evidence was undisputed that the insured had the beginnings of an aneurysm as early as 1954; that it was developing significantly by 1961 and that life expectancy had been shortened because of this condition and related heart murmurs. There was medical evidence for defendant that the aneurysm contributed to the death. Other medical evidence was to the effect that the trauma caused the aneurysm to rupture causing death. The court said, with respect to the insured's condition before the accident, that:

> The evidence offered on behalf of the plaintiff also showed that Whitney Smith was 66 years of age at the time of his death; that he was engaged in farming operations in Tallahatchie County, and supervised personally his farming operations; that he was president of the Yazoo-Mississippi Delta Levee Board, and attended the meetings regularly; that he was mentally alert and *apparently in good physical condition for a man of his age up* until the time of the accident which resulted in his death. (Emphasis added.)

In discussing applicable law, the court, inter alia, said:

> In discussing the liability of the insurer where the accident and an existing bodily infirmity or disease combined to produce the disability or death in a case of this kind, the text writer in 45 C.J.S. Insurance § 776c, p. 812, says:
>
> ' * * * The insurance company, however, may be held liable where the accident can be considered as the sole and proximate cause of death or disability, although disease or infirmity may have been present as a condition or secondary cause, or where the death is the reasonable and natural consequence of the injury, although disease may have supervened, or where the accident is the true cause of death or injury and the disease but the occasion. So, also, if death or disability results from the accident, the fact that but for

weakness or infirmities produced by former illness or disease it might not have been fatal or as severe will not prevent a recovery.'

The court also cited *Hood,* supra, and quoted from it with approval. It also quoted one statement of the evidence in that case as follows:

It appears clearly from the testimony of Dr. Gamble that the *active* cause of the death was the *accident* and that the *accident precipitated* the other troubles; that, had the accident not occurred, death would not have resulted for some years. (Emphasis added.)

With the exception of the added provision in the insuring provision in *Smith* that there be evidence of the injury *on the exterior of the body,* and the presence of such evidence in *Smith,* the situation there by analogy parallels the case here, and the court in *Smith* permitted a verdict for plaintiff to stand. See also United States Fidelity & Guaranty Company v. Smith, 249 Miss. 873, 164 So.2d 462 (1964), in which the identical death was involved. A jury verdict for plaintiff was affirmed.

After the case here had been submitted, the Supreme Court of Mississippi decided two cases which were called to the attention of the court by counsel. They are Peerless Insurance Company v. Myers, et al., Miss., 192 So.2d 437 (Miss.1966), and Travelers Insurance Company v. Cowart, Miss., 196 So.2d 887 (Miss.1967). In light of those two cases, counsel were requested to and did submit supplemental briefs. The facts in *Cowart* are easily distinguishable. There, the insuring clause was limited to loss "resulting from accidental bodily injuries which are the direct and independent cause of the loss", but there was an explicit exclusion from coverage of *"any loss caused or contributed to by disease".* Obviously, this exclusion is a more severe limitation on recovery than that contained in the language of *Hood, Myers* or the present case. In *Cowart,* the court pointed out:

[T]he conclusion is inescapable that Cowart's preexisting disease, if not the sole cause, at the very least was a sub-stantial contributing cause of his death. The policy clearly afforded no coverage under the circumstances appearing in this record. * * * Under the plain terms of this limited type of accident policy, in order to be covered, death must have so resulted and in addition, must not have been 'caused or contributed to by disease.'

It may be significant that in deciding *Cowart* the court cited only Mutual of Omaha Insurance Company v. Deposit Guaranty Bank and Trust Company, supra, as the single case controlling. It is to be noted that the policy in that case insured against "bodily injuries sustained through accidental means and independently and *exclusively of disease* * * ، * ". (Emphasis added.) The language in *Hood* and in the case here is not that narrow.

It is also clear that Cowart had suffered a series of heart attacks and related ailments which were *known to him,* including a partial paralysis of the left arm and face. That case affords defendant little comfort here.

In *Myers,* the court succinctly stated the basic issue as follows:

The issue is whether there was enough evidence to support a finding that a trip of an hour's duration in a taxi cab caused carbon monoxide poisoning of insured, *which activated a latent heart condition,* and resulted in her death. We think there was, and thus affirm the judgment. (Emphasis added.)

The policy there insured "against loss resulting directly and independently of all other causes from accident or bodily injuries sustained during the term of this policy".

Evidence of pre-existing disease as to Mrs. Myers (the insured) included the fact that she had suffered a heart attack in November, 1963, for which she was hospitalized. However, her doctor permitted her to take a trip to Florida in the spring of 1964 and permitted her to take the trip to Texas and Mexico during which she died. The accident or bodily injury consisted of an apparent incident of carbon monoxide poisoning in a closed

automobile during a trip of from forty-five minutes to one hour. There was some evidence of a reaction from the carbon monoxide poisoning with respect to the other four ladies who were with Mrs. Myers, but only Mrs. Myers was fatally stricken. The physician who attended her at the time of her death stated on the death certificate that death was caused by "appeasement of the cardiac wall as a result of generalized sclerosis of the main artery". But, he stated that he "did not rule out carbon monoxide poisoning as having produced the attack". One doctor was of the opinion that carbon monoxide poisoning "triggered the heart condition that caused her death". Medical evidence for defendant was to the effect that the most probable cause of death was arteriosclerotic heart disease. A pathologist could not establish the cause of death but said the symptoms were those of a cardiac failure of some sort.

Despite the disjunctive phrasing of the insuring clause, "accident or bodily injury", the court, in stating the controlling principles of law, said:

> In cases involving insurance policies which allow recovery for 'loss resulting directly and independently of all other causes from accidental bodily injury,' recovery may be had where the accidental injury aggravates, renders active, or sets in motion a latent or dormant pre-existing physical condition or disease, which in turn contributes to the disability or death for which recovery is sought, and where the accidental injury is a proximate cause of the resulting loss. (Citing authorities.)

> Moreover, death by asphyxiation from inhaling carbon monoxide gas from the exhaust of a gasoline motor is regarded as accidental, or from accidental means, if the breathing of the gas was unintentional. (Citing authorities.)

A judgment against the insurance company was affirmed, and the court cited with approval Police and Firemen's Insurance Association v. Mullins, 260 Ala. 173, 69 So.2d 261 (1953), and Cantrall v. Great American Casualty Company, 256 Ill.App. 47 (1930). In *Mullins*, the insured under an accidental death policy went to the basement to fix a coal-fired furnace. The house and basement were filled with smoke. He apparently had a pre-existing atherosclerosis. Two of his dogs that were in the basement became sick, and one died. Insured died early the next morning. The court held that whether the death was caused by carbon monoxide poisoning, and whether it activated a pre-existing atherosclerotic condition, were questions of fact for the jury. *Cantrall* involved the death of a garage employee from inhaling the exhaust of running motors, and, apparently from a pre-existing heart condition. Judgment for the insured on an accident policy was affirmed.

The Court of Appeals of this circuit has applied Mississippi law to cases of the type here at least twice. In Boult v. Maryland Casualty Company, 5 Cir., 111 F.2d 257 (1940), the insuring clause covered death "resulting from Bodily Injury, effected solely through External, Violent and Accidental Means, independently and exclusively of disease". The insured was involved in an automobile accident after which he appeared to be dazed and stunned. Getting out of his automobile, the insured walked about a block during which time he slumped forward. When he reached a filling station, he fell and had to be helped inside, at which time one side of his face was very red and his left leg and arm were impaired.[5] He was found by a physician to be suffering with a cerebral hemorrhage, was unconscious by the early part of the evening and died that night. The evidence for plaintiff was that the insured had been in good health, although one daughter testified that she knew he had high blood pressure. Medical evidence for plaintiff was that the cerebral hemorrhage was caused by the accident, and that it was "most probable" that the accident caused the hemorrhage. Physicians testifying for defendant were of the opinion that the insured died as a result of thrombosis in-

---

5. These are not attributed to the accident in the opinion.

duced by natural causes "rather than cerebral hemorrhage".

Trial to a jury resulted in a verdict for plaintiff, but afterward the district court entered a judgment for defendant n. o. v. The Court of Appeals reversed citing United States Fidelity & Guaranty Company v. Hood, supra, and Metropolitan Life Insurance Company v. Williams, supra, saying that "The evidence makes a case for the jury." " * * * The jury found * * * that insured came to his death as a result of violent and external injury and returned a verdict for the appellee." And further, "The verdict of the jury should have been upheld and the court erred in setting aside the original judgment and rendering judgment for the defendant."

In New York Life Insurance Company v. Schlatter, 5 Cir., 203 F.2d 184 (1953), suit was for death under the double indemnity provisions of a policy which provided:

> The Double Indemnity * * * shall be payable * * * (if) the death * * * resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means * * *.
>
> (It) shall not be payable if the * * * death resulted * * * directly or indirectly, from infirmity of mind or body, from illness or disease, or from any bacterial infection other than bacterial infection ocurring in consequence of accidental and external bodily injury.

Mrs. Schlatter (the insured) suffered a fall in which her hip was broken, for which she was hospitalized. Because of her age (63), she was not operated on until ten days later. She died about twelve hours thereafter. Before the fall, she was already suffering from high blood pressure, heart trouble and various other serious ailments for which she had been drawing total disability payments under this same policy. Apparently, substantial medical evidence was that she could have died from her pre-existing ailments at any time, irrespective of the accident. Medical evidence for plaintiff, however, was to the effect that the broken hip "is what brought the whole thing on—started the momentum". A verdict and judgment for plaintiff was affirmed, and the court cited United States Fidelity & Guaranty Company v. Hood, supra, with approval and quoted extensively therefrom. In a special concurring opinion, Judge Holmes, inter alia, said:

> The Mississippi law, under the terms of the policy in the instant case, does not require the court or the jury to consider the cause of causes; it would be impractical to do so. As Bacon says, it were infinite with the law to consider causes that would lead us back to the birth of a person, 'for if he had never been born the accident would not have happened.' *It is the cause causing the death, not the condition without which the death would not have occurred* (the causa causan, not the causa sine qua non), that fixes liability under a policy for accident insurance or under a provision for double indemnity in case of death from bodily injury effected solely through violent and accidental means. (Emphasis added.)

One of defendant's principal positions which was vigorously advanced at trial and is again just as vigorously urged now, is the absence of any external evidence of any bodily injury within the meaning of this policy. Defendant contends that under the law a shock or fright or emotional disturbance or other psychic trauma does not constitute "bodily injuries". At the time of the trial, this court, with some reluctance, followed such cases as Pierce v. Pacific Mutual Life Insurance Company, 7 Wash.2d 151, 109 P.2d 322 (1941),[6] since it seems to be

---

**6.** See also Continental Cas. Co. v. Thompson, 369 F.2d 157 (9 Cir. 1966) (shock caused by earthquake, a bodily injury); Tomnitz v. Employers Liability Assurance Corp., 121 S.W.2d 745 (Missouri 1938) (silicosis, a bodily injury); and, e. g., Herbert v. New Amsterdam Casualty Co., 1 S.W.2d 608 (Tex.1928) and O'Pry v. Security Union Cas. Co., 1 S.W.2d 590 (Tex.1928) (heat stroke or exhaustion is bodily injury).

illustrative of the rationale and an extension of the application of the *Hood* doctrine. Although there was medical testimony that shock or psychic trauma itself could not have induced the symptoms of cerebral hemorrhage as early as the time when the insured slumped at the wheel of his automobile, the court felt that this was a case for the jury and that the jury would be warranted in finding that fright or shock was the sole proximate cause of the injury. This was despite the fact that for 10 or 15 years the insured had known that he was affected with high blood pressure and advanced arteriosclerosis. This pre-existing condition, according to the evidence, was adequate to cause the hemorrhage or to otherwise cause death at any time, independent of any accident. A part of the language used by the court is as follows:

> The difficulty is always that of applying the definition (of proximate cause) to a given state of facts, that is, to determine what was the thing that set in motion a train of events which brought about a certain result, and whether or not other factors were intervening forces 'operating or working actively from a new and independent source'.

> We think the only reasonable interpretation to be placed upon this clause is to say that the injury must stand out as the predominant factor in the production of the result, and not that it must have been so virulent in character as necessarily and inevitably to have produced that result, regardless of all other conditions and circumstances. People differ so widely in health, vitality, and ability to resist disease and injury that what may mean death to one man would be comparatively harmless to another, and therefore the fact that a given injury may not be generally lethal does not prevent it from becoming so under certain conditions; and if, under the peculiar temperament or condition of health of an individual upon whom it is inflicted, such injury appears as the active, efficient cause that sets in motion agencies that result in death, without the intervention of any other independent force, then it should be regarded as the sole and proximate cause of death. The fact that the physical infirmity of the victim may be a necessary condition to the result does not deprive the injury of its distinction as the sole producing cause. In such case, disease and low vitality do not rise to the dignity of concurring causes, but, in having deprived nature of her normal power of resistance to attack, appear rather as the passive allies of the agencies set in motion by the injury.

The appellant may have had a diseased condition which deprived him of the normal power of resistance to the effect of undue strain or fright, and it may have been a necessary condition to the result, but his physical condition did not necessarily deprive the strain or fright of its character as the predominant factor in the production of the result. In other words, appellant's prior state of health was but a condition, and not a concurring cause.

In *Pierce*, an attorney fearing an anticipated automobile accident, swerved his automobile, avoided the accident, and thereafter slumped at the wheel with some apparent disability. He revived, drove to his office, and was thereafter observed to be in a bad state and was taken to a hospital where he was found to be suffering from cerebral hemorrhage.

At trial, this court also relied upon the annotation in 93 A.L.R.2d 578, et seq.,[7] which cited a number of cases in which death or injury resulting from shock or psychic trauma has been held to be within an accident policy, despite the absence of physical impact. Additionally, the court was further persuaded to its view by

---

7. Some of the relevant cases there annotated are: McGlinchey v. Fidelity & Casualty Co., 80 Me. 251, 14 A. 13 (1888); Kennedy v. United States F. & G., 113 N.J.L. 431, 174 A. 531 (1934); International Traveler's Ass'n v. Branum, 169 S.W. 389 (Tex.1914); Faircloth v. Fidelity, 54 App.D.C. 286, 297 F. 681 (1924).

what the United States Supreme Court had to say in the early case of United States Mutual Accident Association v. Barry, 131 U.S. 100, 9 S.Ct. 755, 33 L.Ed. 60 (1889). In that case, there was conflicting medical evidence as to the cause of death with plaintiff's view being that it came about by reason of a construction of the duodenum, or intestine, caused from the jarring of a jump. *There was no external evidence of a bruise, contusion or any other physical trauma.* The court quoted from an extensive charge given by the district court with approval and decided there was no error in these instructions or in the determination by the jury that the death was covered by the accidental bodily injury provision of the insurance policy. A part of the language of that opinion is quoted:

> The defendant claims that, if Dr. Barry did sustain injury, it was one of which there was no external and visible sign, within the meaning of the certificate of insurance, and therefore, that the plaintiff is not entitled to recover. (Counsel are understood to contend that no recovery could be had under a certificate of insurance in the form and terms of this one, if the injury was wholly internal. In that view the court cannot concur. It is true there must be an external and visible sign of the injury, but it does not necessarily follow from that that the injury must be external. That is not the meaning or construction of the certificate. Such an interpretation of the contract would, in the opinion of the court, sacrifice substance to shadow, and convert the contract itself into a snare, an instrument for the destruction of valuable rights. Visible signs of injury, within the meaning of this certificate, are not to be confined to broken limbs or bruises on the surface of the body. There may be other external indications or evidence which are visible signs of internal injury. Complaint of pain is not a visible sign, because pain you cannot see. Complaint of internal soreness is not such a sign, for that you cannot see; but if the internal injury produces, for example, a pale and sickly look in the face, if it causes vomiting or retching, or bloody or unnatural discharges from the bowels, if, in short, it sends forth to the observation of the eye, in the struggle of nature, any signs of the injury, then those are external and visible signs, provided they are the direct results of the injury. * * *

■ However, since the trial, and the court's actions then, Peerless Insurance Company v. Myers, et al., supra, has been decided by the Supreme Court of Mississippi. That decision should put at rest any question as to whether the amazing, unexpected, unintended, unforeseen, dramatic, frightening and stressful results which immediately came about when Mr. English short-circuited the electricity for several counties and released millions of volts of electrical energy all about him could be found by the jury to be a bodily injury, within the meaning of the contract of insurance. Even defendant's expert cardiologist conceded that such a situation could be sufficiently frightening and stressful to provoke a fatal heart attack in a perfectly healthy person.[8] This court has no doubt that the Supreme Court of Mississippi would hold that such an occurrence would warrant a finding of "bodily injury".

## VI.

The courts of Mississippi in their cases have repeatedly used the words "latent", "dormant", "active" and "virulent" in making distinction to either permit or deny recovery. Hence, an understanding of the meaning of these words is indicated.

Bouvier's Law Dictionary (Third Revision) defines two of these words as follows:

Latent. Hidden; concealed; not appearing on the surface or face of a thing.

---

8. It was his firm opinion, however, that this occurrence had nothing to do with the death of Mr. English.

Dormant. Sleeping; silent; not known; not acting. * * *

Black's Law Dictionary (Third Edition) defines those two words this way:

Latent. Hidden; concealed; that does not appear upon the face of a thing * * *

Dormant. Literally, sleeping; hence inactive; in abeyance; unknown; concealed; silent.

Webster's New International Dictionary of the English Language, Second Edition, Unabridged (1961), defines "dormant" as:

Appearing or being in a state of suspended animation; not in action or exercised; inactive; quiescent; also not disclosed or asserted * * * applied to buds or to other parts of a plant in winter; also to buds ordinarily inactive but which may develop at any time through some special cause.

"Latent", in that same authority, is said to derive from several language sources. The Latin meaning "to lie hid or concealed", the Greek meaning "to escape notice" and the Slavic meaning "to lie in wait for". And, it is defined as:

Not visible or apparent; hidden; dormant; disguised, being something in reality without having appearance of it.

The synonyms given for "latent" are dormant, quiescent, potential, suspended. It is also said, "latent applies to that which is present without showing itself; dormant to that which is present without manifesting activity."

The medical use of the word is given as "Latent.—the time in which a disease is supposed to be existent without manifesting itself." The same dictionary describes *active* as an antonym of *latent* and defines virulent as derived from the Latin and French words for poison, meaning, "extremely poisonous or venomous * * * bitter in enmity, malignant,". The medical usage of the word is given as "characterized by rapid course and malignancy, said of diseases, infections".

Random House Dictionary of the English Language, Unabridged (1966), says of these words the following:

Active: Constantly engaged in action * * * Medical: Acting quickly, producing immediate effects * * * as of a volcano, erupting.

Dormant: Lying asleep or as if asleep * * * of a volcano, not erupting * * * undisclosed, unasserted * * * temporarily inactive.

Latent: (1) Present, but not visible, apparent or actualized. Existing as a potential. (2) Pathological—(of an infectious agency or disease) in a resting or hidden phase, dormant. (3) Existing in a concealed or dormant form but potentially able to achieve expression * * * Latent emphasizes the hidden character of the dormancy of what is named (latent defects or diseases.) that which is potential, exists in an yet undeveloped state, but is thought of as coming into full being or activity at some future time: potential genius or tragedy. Potential may be applied also to tangibles: i. e., high tension wires are a potential source of danger * * * Antonym: (1) Open, active, kinetic * * * latent: the period that elapses before the presence of a disease is manifested by symptoms.

Virulent: Medical—highly infective, malignant or deadly, of the nature of an organism causing specific or general clinical symptoms.

Applying any of the foregoing definitions, it is apparent that Mr. English's pre-existing condition was definitely dormant and latent, since it was not symptomatic, was not manifested and had not caused any suffering or complaint at any time. It could not in any way be classified as active and virulent if active means the opposite of latent and is actually an antonym of both latent and dormant. Nor can it be said to be virulent when virulent is characterized by a rapid course and is said to be a disease which causes specific or general clinical symptoms, *since Mr. English had no symptoms.*

The jury obviously found his condition to be latent and dormant, not active and virulent, and this they were justified in doing.

## VII.

■■■ The gist of the evidence was stated heretofore substantially in its most favorable light with respect to the jury verdict, since it must be so considered by this court in deciding the judgment n. o. v. aspects of defendant's motion. And the quantity and quality of proof necessary to make out a case for submission to the jury is determined by federal (not state) law. Planters Mfg. Co. v. Protection Mut. Ins. Co., 380 F.2d 869 (5 Cir. 1967). As will be seen by reading that case, the Supreme Court and the Court of Appeals of this circuit have circumscribed the power of federal judges to dispense with a jury in resolving disputed questions of fact. Cf. Denman v. Spain, 242 Miss. 431, 135 So.2d 195 (1961).

■■■ From what has been said heretofore, it is clear that the facts are in dispute in such a way that fair-minded men may draw different inferences therefrom, and even if it could be said that a measure of speculation and conjecture entered into the return of this verdict (which is not the case at all), obviously, the jury chose what seemed to them to be the most reasonable inference. It certainly could not be said that there is a complete absence of probative facts to support the conclusion reached, and therefore, defendant is not entitled to judgment n. o. v., but the verdict must and does withstand this phase of defendant's attack. Planters Mfg. Co. v. Protection Mut. Ins. Co., supra, and authorities there cited. See also Tidwell v. Ray, 206 F.Supp. 952 (N.D.Miss.1962).

## VIII.

■■■ Now, however, in giving consideration to defendant's alternative motion for a new trial, this court is not so hobbled. It may rely upon its own judgment as to the weight of the evidence. Hampton v. Magnolia Towing Co., 338 F.2d 303 (5 Cir. 1964); Planters Mfg. Co. v. Protection Mut. Ins. Co., supra, and Tidwell v. Ray, supra.

It needs saying that the medical witnesses did not have a common understanding of the meaning of the critical words "latent", "dormant", "active" and "virulent". The result was that at least one of plaintiff's witnesses made his responses, to hypothetical and leading questions asked during skillful cross-examination, in such a way as to make his position seem ambiguous or equivocal. Two of such witnesses for plaintiff, however,[9] were consistent in expressing their views, in substance, that the fright and shock resulting from the switching error was the effective cause of death and that except for the incident, Mr. English would not have then died. One clearly classified the pre-existing disease as latent or dormant and not active and virulent, within the aforementioned definitions of these words. The other stated that his answers would depend on how the terms were defined, and his answers on cross-examination were limited and conditional, so that his prime view was unmistakable.

Only one such witness supported defendant's thesis that the death of Mr. English was not related in any way to the fright and shock, but, that, instead it was caused solely and only by the pre-existing atherosclerotic condition. This was defendant's cardiologist. The jury was not persuaded to his view, but chose to accept the views of plaintiff's witnesses—as they had a right to do.

This court would not, in this state of the evidence, be justified in saying that the verdict was against the overwhelming weight of the evidence. It will not do so. In fact, it is in accord with what was the clear preponderance of the evidence.

---

9. The general practitioner who examined the insured's body immediately after death and plaintiff's internist-cardiologist.

## IX.

Defendant complains also about certain portions of the instructions to the jury, about the refusal to give certain instructions requested by defendant, and about the form of interrogatories for answer by the jury along with the return of a general verdict. Rule 49(b), Federal Rules of Civil Procedure. Most of these complaints have already been dealt with in earlier parts of this opinion, e. g., whether vel non fright and shock (or psychic trauma) absent external evidence of injury can be "bodily injury" under such a contract of insurance. Moreover, a reading of the instructions as a whole will disclose that the law as announced, defined and developed by the Mississippi Supreme Court was fairly stated to the jury with reasonable clarity.

Defendant devotes little effort in its elaborate briefs to the complaint about the form of the interrogatories which were for answer by the jury. Three were submitted for answer "yes" or "no" as follows:

Interrogatory No. 1:

Do you find from a preponderance of the evidence that the switching error was an accident? [10]

Interrogatory No. 2:

Do you find from a preponderance of the evidence that such accident caused bodily injuries to Elbert W. English?

Interrogatory No. 3:

Do you find from a preponderance of the evidence that the switching error was the proximate cause of the death of Elbert W. English and that such death resulted directly and independently of all other causes from this switching error?

The interrogatory forms as actually handed to the jury had instructions thereon for answers of "yes" or "no" to be made to No. 1, No. 2 and No. 3, and that answer need not be made to No. 3 if either No. 1 or No. 2 was answered "no". Additionally, in the oral instructions the jury was clearly told how they should deal with the interrogatories.

Interrogatories No. 2 and No. 3 presented to the jury the two vital questions which were at issue. (They could be improved as to form and content, e. g., No. 3 could well have included "switching error" *and* "the bodily injuries resulting therefrom".) All these interrogatories were hastily drawn by the court when counsel had conferred at the court's direction to agree, if possible, on forms of interrogatories, and were unable to do so. (Also see Footnote 10, supra.)

▮ The interrogatories, especially when considered with the whole of the oral instructions given, concisely presented the fact issues to the jury under controlling Mississippi law. The jury should not have been mislead, and in the court's opinion, they were not. There the matter should stand.

The motion of defendant is not well taken in either of its alternatives.

Order will be entered in accordance with this opinion.

---

10. Complaint is made that the instructions did not define "accident". But since both parties and the court, at least tacitly, accepted the fact that this error was an accident, submission to the jury of this interrogatory was harmless surplusage. (In fact an instruction to the jury that the switching error was an "accident" within the meaning of the policy probably would have been proper.) This is especially so because it is obvious that defendant conceded it to be an accident at least twice in making its requests for instructions numbered 1 and 2. Number 1 was to the effect that the burden was on plaintiff to prove that the "switching error" (i. e., the accident) caused the death independently and exclusively. Number 2 was to the effect that the jury must find that English "met his death solely by reason of the switching error (accident) and not by reason of a pre-existing coronary artery disease or any other cause". *(Complaint is now made of the court's refusal to give these two request!)*