# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 2000-KA-00234-SCT

*ARTIS AUSTIN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/03/1999 |
| TRIAL JUDGE: | HON. KENNETH L. THOMAS |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | THOMAS H. PEARSON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  JOHN R. HENRY |
| DISTRICT ATTORNEY: | LAURENCE Y. MELLEN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/03/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 5/24/2001 |

### BEFORE PITTMAN, C.J., SMITH AND EASLEY, JJ.

### PITTMAN, CHIEF JUSTICE, FOR THE COURT:

¶1. This is a criminal appeal from a judgment of the Circuit Court of Coahoma County, Mississippi, Circuit Judge Kenneth L. Thomas, presiding, wherein Artis Austin was convicted of capital murder and sentenced to life in prison without the possibility of parole. The indictment alleged that Austin, in concert with one Carlos Williams, committed the crime of robbery, and in the process, shot and killed Mrs. Johnnie Moore. The trials of Austin and Carlos Williams were severed, and an Order Transferring Venue to Panola County, Mississippi was entered on August 3, 1999 pursuant to defense counsel's request. After a jury trial, final judgment was entered on September 3, 1999. The trial court denied Austin's motion for a JNOV or a new trial, and this appeal was timely filed.

## FACTS

¶2. On Friday, August 29, 1997, Johnnie Moore was working with her friend Ruth Hope Morganti at the McNeil Payment Agency in Clarksdale, Mississippi. At the Payment Agency, Moore and Morganti accepted payments for telephone and water bills. Moore was sixty-nine years old. She and Morganti had known each other since 1950, when they were employed together by the Southern Bell telephone company.

¶3. Around 11:30 in the morning, Moore and Morganti were sitting behind the payment windows at the Payment Agency. There were several customers present. A man walked over to Mrs. Morganti's side of the counter and slid an envelope under the window to her. When she opened it, she found that it did not contain a bill, but rather a blank piece of paper. Sensing that something was wrong, Morganti stooped down to sound an alarm that was built into the payment counter. As she was attempting to engage the

alarm, Morganti heard a "real loud noise." She testified that when she raised up, a man had jumped on to the counter and was pointing a gun at her. She quickly stooped back down and heard Moore push her chair back and say, "Oh, no." She then heard a shot. Morganti then turned on the alarm and looked to see if Moore had been shot.

¶4. Morganti saw that Moore was bleeding from her chin. Moore stood up and walked into a back office. Morganti called 911 to report the robbery and the shooting. When she went into the back office, Moore had fallen to the floor. The cause of Moore's death was established by Dr. Steven Timothy Hayne. Moore died of wounds to her chin, neck, and chest caused by a large caliber bullet. Dr. Hayne testified that Moore likely lived and was conscious for some five minutes after having been shot. The gunman absconded with nearly two thousand dollars.

¶5. Various witnesses were present in or around the vicinity of the Payment Agency at the time of the incident. Each witness testified to seeing a stocky or heavy man with a gun running away from the scene of the crime. Most testified that the man was wearing a striped shirt and dark trousers, that the man tripped and almost fell while running down the street, and that the man dropped some money during his flight.

¶6. Ethel Ingram of Clarksdale was present at the Payment Agency. She observed a man kneeling on the counter in front of Mrs. Moore, pointing a gun at her. Ingram testified that the man's face was at least partially covered with what might have been a scarf of some kind and that the man wore a striped shirt.

¶7. David Davidson, who was ten years old at the time of the trial, was sitting in his grandmother's car outside the Payment Agency when the robbery and shooting occurred. Also in the car were Davidson's grandmother, sister, and brother. While sitting in the car, David heard a gunshot coming from within the Payment Agency. He observed three men running from the business. He testified that the man holding the gun was "chunky" in build, and that the man tripped and almost fell while running. David identified a striped shirt and trousers at trial as those worn by the chunky man with the gun.

¶8. Anneye Davidson, eleven years of age at the time of trial, testified that she also heard a gunshot while sitting in her grandmother's car. She also observed three men running out of the building, and she testified that the first man was "really heavy." She noticed that while running, the fat man tripped and dropped a gun. Anneye testified that the man also dropped some money and that he stopped to pick up both the gun and the money. At trial, she identified a striped shirt and a pair of pants at trial as those worn by the heavy man who tripped and fell while running. She further identified Austin at trial as being the "chubby guy" she observed running from the Payment Agency.

¶9. Charles Hooper, an employee with the Clarksdale Police Department, was in the post office on personal business between 11:30 and noon on August 29, 1997. One Calvin Sanders came into the post office and informed Hooper that someone was robbing the McNeil Payment Agency. Hooper walked outside the post office and saw a person running towards him with a silver and gold pistol in his hand. Hooper testified that at first, he did not know who the man was. Hooper stated that he later "distinguished [the man] by his build and his hair" because he had a chance to look at the man as he passed, and that he "figured out who he was then after that." Hooper testified that he had attended high school with Austin and that he had known that man for some five to six years. Hooper identified Austin at trial as the man who ran toward him with a gun in his hand. Hooper testified that Austin's appearance had changed since the last time Hooper had seen him in that Austin had lost a good deal of weight and had cut his long hair. Hooper testified that at the time of the robbery and shooting, Austin was "heavy" with "a real big behind."

¶10. James Piggie testified that while he was attempting to park behind the post office on August 29, he heard the sound of gunfire. He looked toward the Payment Center and saw four legs sticking out from the counter. After hearing a shot, James saw two men running down the street. He testified that one of the men tripped, that money flew out of the man's hand, and that the man tried to pick up the money.

¶11. Detective Sergeant Danny Hill responded to robbery and shooting. He investigated the area around the railroad track into which Austin had been seen to run. After a fruitless search, Hill went back to the Payment Center. Shortly thereafter, Hill was advised by another officer that the resident of a house some 75 to 100 yards from the railroad tracks had called the police to report a suspicious noise beneath her house. Hill discovered, in the crawl space beneath the house, a striped shirt, a pair of black pants, a white cap, a black "mask looking thing", and a pistol. The object that was shaped like a mask was composed of "pantyhose type material." A hair consistent with Austin's head hair was found in the pantyhose material. The pistol held five rounds of ammunition, and one round had been fired. An expert witness testified that the bullet that struck and killed Mrs. Moore originated from the gun left beneath the house.

¶12. Officer John D. Chambers also participated in the initial search for the suspects. He was positioned near the railroad tracks. While standing his post, Chambers observed a man walking out into one of the streets in the area. When the man discovered that he had been seen by Chambers, the man ran away and disappeared around the railroad depot. Chambers testified that the man was wearing dark pants, and that he weighed between 200 to 220 pounds. Chambers had known Austin for over fifteen years, and he identified Austin at trial as being the man he observed and chased on the day of the shooting and robbery.

¶13. On the day of the robbery, Artis Austin and Carlos Williams traveled to Tunica, Mississippi, and then to Memphis, Tennessee. They next took a Greyhound bus to Chicago, Illinois. They were apprehended a short time later.

## DISCUSSION

### I. WHETHER THE EIGHTH AMENDMENT PROHIBITS THE USE OF THE UNDERLYING FELONY IN A FELONY MURDER CONVICTION AS AN AGGRAVATING FACTOR IN SENTENCING, THEREBY RENDERING MISS. CODE ANN. § 99-19-101(5)(D) UNCONSTITUTIONAL?

#### A. Whether the Eighth Amendment allows the underlying felony to also be used as an aggravating factor.

¶14. Artis Austin was convicted of capital felony murder under Miss. Code Ann. § 97-3-19(2)(e) with an underlying felony of robbery. During the sentencing phase, the trial court directed the jury to consider, as an aggravating factor in sentencing, that the killing was committed during the commission of a robbery. Austin argues that the use of the underlying felony of robbery as an aggravating factor amounted to a "double counting" of the underlying crime in violation of Austin's Eighth Amendment rights. Further, Austin asks the Court to hold that Miss. Code Ann. § 99-19-101(5)(d)[1] (2000) is unconstitutional when a defendant such as Austin has been convicted of felony murder as defined in Miss. Code Ann. § 97-3-19[2] (2000). Austin asks the Court to redress the alleged errors by granting him a new sentencing hearing.

¶15. This argument is not properly before the Court in view of the fact that the jury did not return a sentence of death against Austin. Where the jury is given an instruction that allegedly "invites" the death

sentence, yet the instruction does not result in causing the jury to render such a verdict, the verdict will not be disturbed. *Gilliam v. State*, 186 Miss. 884, 192 So.2d 440 (1939). Since Austin did not ultimately receive the death penalty, he has suffered no prejudice arising from the instruction. This Court will not consider alleged errors or issues which have no practical effect in a case. *Nicholson ex rel. Gollot v. State*, 672 So.2d 744, 751 (Miss. 1996).

**B. Whether the prosecution impermissibly expanded the ambit of the "avoiding arrest" aggravator.**

¶16. Over defense counsel's objection, the trial court instructed the jury to consider, as an aggravating factor, that the murder was committed in order to avoid arrest. Austin claims that the submission of this aggravating factor was improper because the prosecution presented no evidence that would bring Austin's crime within the normal ambit of the rule.

¶17. Again, this issue is not properly before the Court. The "avoiding arrest" aggravator relates specifically to the death penalty. Since the jury did not return a death penalty verdict, Austin cannot now claim that he suffered prejudice as a result of the use of such factor. Austin requests a new sentencing hearing. However, because the jury returned a verdict of life imprisonment without parole, the State would be prohibited from seeking the death penalty again. *Lanier v. State*, 635 So.2d 813 (Miss. 1994). Consequently, the issue is moot.

**II. WHETHER THE TRIAL COURT ERRED BY REFUSING TO INSTRUCT THE JURY ON THE STATE OF LAW CONCERNING THE TESTIMONY OF A LAW ENFORCEMENT OFFICER?**

¶18. The standard of review for challenges to jury instructions is as follows:

Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.

*Humphrey v. State*, 759 So.2d 368, 380 (Miss. 2000)(citing *Heidel v. State*, 587 So.2d 835, 842 (Miss. 1991)).

¶19. Austin argues that the trial court erred by refusing his request for a "level playing field" jury instruction--that is, one that noted that the testimony of a police officer is not entitled to greater weight than any other witness. The requested instruction would have advised the jury that:

The testimony of a law enforcement officer should be considered by you just as any other evidence in the case. In evaluating his or her credibility you should use the same guidelines which you apply to the testimony of any witness. In no event should you give either greater or less credence to the testimony of any witness merely because he or she is a law enforcement officer.

The trial court refused the instruction because it was duplicitous of another instruction that had already been granted.

¶20. This Court has previously held that the very same instruction offered by Austin was properly refused.

*See Stewart v. State*, 355 So.2d 94, 96 (Miss. 1978); *Washington v. State*, 341 So.2d 663, 664 (Miss. 1977). The Court recently reiterated its stance in *Hansen v. State*, 592 So.2d 114, 139 (Miss. 1991), noting that the trial court had given the jury the following general instruction:

> As sole judges of the facts in this case, your exclusive province is to determine what weight and what credibility will be assigned the testimony and evidence of each witness in this case. You are required to use your common sense and sound honest judgment in considering and weighing the testimony of each witness who has testified in this case.

*Id.* at 140. This same instruction was granted in the case sub judice. *Hansen* further stated that:

> Our law of criminal procedure has long perceived dangers in comments upon the evidence, and in that regard we have for years had a statute, Miss.Code Ann. § 99-17-35 (1972), which reads in pertinent part: The judge in any criminal cause, shall not sum up or comment on the testimony, or charge the jury as to the weight of evidence....It is certainly true that of late our attitude toward comments upon the evidence may have relaxed, see *Nichols v. Munn*, 565 So.2d 1132, 1136-37 (Miss.1990); *Weaver v. State*, 497 So.2d 1089, 1094 (Miss.1986), but not so much that we will require the instruction at issue. We affirm on this issue.

*Id.* at 141.

¶21. Though Mississippi law is clear on this issue, Austin nonetheless argues that the refusal of the trial court to "level the playing field" resulted in a denial of his right to due process. Austin argues that courts routinely act contrary to the holdings in *Stewart, Washington,* and *Hansen* by granting cautionary instructions regarding informant testimony. It is true that where the State's case is based upon the testimony of an accomplice, corroborated only by a confidential informant, the trial court must grant a cautionary instruction. *See Edwards v. State*, 630 So.2d 343, 344 (Miss.1994); *Parker v. State*, 378 So.2d 662, 663 (Miss.1980). The policy behind granting a cautionary informant instruction, however, is based on the fact that informant or accomplice testimony, by its very nature, is looked upon with suspicion and distrust. This rationale does not extend to police officer testimony.

¶22. For the aforementioned reasons, this assignment of error is without merit.

### III. WHETHER THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF PURPORTED FLIGHT, AND IN REFUSING TO GIVE A CIRCUMSTANTIAL EVIDENCE INSTRUCTION AFTER ADMITTING THIS EVIDENCE?

#### A. Whether the trial court erred in admitting evidence of purported flight.

¶23. Admission of evidence is within the discretion of the trial judge. That discretion must be exercised within the scope of the Mississippi Rules of Evidence, and reversal will only be had when an abuse of discretion results in prejudice to the accused. *Parker v. State*, 606 So.2d 1132, 1137-38 (Miss.1992).

¶24. Austin is correct in his assertion that a flight instruction should only be given in cases where the defendant's flight (1) is unexplained and (2) where the circumstance of that flight has considerable probative value. *See [Fuselier v. State](#)*, 702 So.2d 388, 390 (Miss. 1997); *Pharr v. State*, 464 So.2d 294 (Miss. 1984); *Pannell v. State*, 455 So.2d 785, 788 (Miss. 1984). The record indicates that a flight instruction was neither requested nor granted. The issue now becomes whether that two-prong test must be met in

order to introduce *evidence* of flight, even in cases where a flight instruction has not been requested.

¶25. This Court has answered that question in the affirmative. *See Fuselier*, 702 So.2d at 390; *Mack v. State*, 650 So.2d 1289, 1309 (Miss. 1995). In both *Mack* and *Fuselier*, the defendants argued that evidence of flight was inadmissible even though a flight instruction had never been requested. In *Mack*, this Court held flight evidence to be inadmissible because the defendant had two other reasons for fleeing. *Mack*, 650 So.2d at 1309. *Mack* extended that rule, based on the Court's prior holding in *Fuselier*, and held that not only flight instructions, but also evidence of flight is improper when independent explanations have been offered. The *Mack* Court reasoned that, "[a]lthough this Court [in *Fuselier*] did not explicitly state evidence of flight is inadmissible when independent reasons exist to explain the flight, it implicitly did so." *Mack*, 650 So.2d at 1309. The Court further stated that, "[i]f a prosecutor cannot give a jury instruction on flight because evidence of flight is probative of things other than the defendant's guilt or guilty knowledge, it follows that the prosecutor should not be allowed to place the evidence before the jury. *Id.* at 1310.

¶26. Austin claims that once he put forth evidence to show a non-prejudicial reason for his departure, the burden of production shifted back to the prosecution to overcome this evidence. Austin claims that the trial court erred in admitting evidence of his "flight" to Chicago since the prosecution never met their burden of "overcoming" his evidence.

¶27. In particular, Austin contests the admission of Veronica Stevenson's testimony. Stevenson's testimony indicated that she and Austin were both passengers on a bus to Chicago on August 29, 1997. Austin now argues that Stevenson's testimony should not have been admitted. This assignment of error fails for two reasons.

¶28. First, Austin never objected to Stevenson's testimony regarding the bus ride to Chicago. Consequently, this assignment of error is procedurally barred. *Lester v. State*, 692 So.2d 755, 773 (Miss.1997); *Carr v. State*, 655 So.2d 824, 853 (Miss.1995).

¶29. Alternatively, Austin's contention is without merit. Evidence of flight is admissible as proof of consciousness of guilt. Evidence of flight may be introduced, even where no flight instruction is sought, as long as such evidence is not probative of "things other than guilt or guilty knowledge of the crime charged." *Fuselier*, 702 So.2d at 390; *Mack,* 650 So.2d at 1309. The State contends that since the evidence of Austin's flight was not probative of anything other than flight, and since it was unexplained, the evidence was therefore admissible. Austin argues that since his flight was explained, the second prong of the *Pannell* test was not satisfied.

¶30. The "explanation" to which Austin refers is the testimony of Robert Lee Holmes was called by the prosecution, not Austin. Austin claims that Holmes's testimony explains his flight so that as a result, the State has not met the second prong of the *Pannell* test.

¶31. Austin claims that Holmes's testimony proves that it was "quite natural" and "not at all uncommon" for him to go to Chicago, St. Louis, or New Orleans. On the contrary, Holmes testified that he talked with Austin on the day of the crime, after the murder but before Austin went to Chicago, and that Austin said he planned to go to Chicago *in the future*. Nothing was said about Austin *routinely* traveling to Chicago. Further, it should be noted that Austin was in Tunica, some fifty miles from Clarksdale, when he made the statement about going to Chicago. In other words, Austin's "flight" had already begun, and no explanation

was ever offered for Austin's presence in Tunica at the time he spoke with Holmes.

¶32. Austin's statement to Holmes about going to Chicago does not qualify as an independent reason for leaving Clarksdale after the crime had been committed. This Court has previously held that the following "explanations" were substantial enough so that a flight instruction was not proper: defendant was an escapee, was driving a stolen car, was leaving based on threats from another person or from potential danger from victim himself. The common factor is that, in those circumstances, it would have been illogical for a defendant not to have run. Austin's vague, future plan to go to St. Louis or Chicago does not rise to the level of being an independent explanation for fleeing from the scene of the crime. Therefore, the first prong of the *Pannell* test is satisfied, as Austin's flight was unexplained.

¶33. In summary, there is no independent reason for Austin's journey to Tunica, or his subsequent trip to Memphis and then to Chicago. His presence in Tunica remained unexplained, and his comment about going to Chicago "in the future" did not indicate a reason for going there other than to escape. Accordingly, the State's evidence did not fail the first prong of the *Pannell* test as Austin's flight was not "explained."

### B. Whether the trial court erred in refusing to give a jury instruction on circumstantial evidence.

¶34. A circumstantial evidence instruction should be granted where the State is without a confession or eyewitnesses to the offense charged. *Haynes v. State*, 744 So.2d 751, 753 (Miss. 1999); *Ladner v. State*, 584 So.2d 743, 750 (Miss. 1991). This Court has held that where there is direct evidence of a crime, the circumstantial evidence instruction need not be given. *Sullivan v. State*, 749 So.2d 983, 992 (Miss. 1999) *Mack*, 481 So.2d at 795. Austin argues that when the prosecution relies on nothing more than an inference that Austin's flight was occasioned by a guilty conscience, a circumstantial evidence instruction should be given. Austin's broader argument, however, is that the trial court erred in refusing to give a jury instruction on circumstantial evidence because the prosecution's case rested entirely on circumstantial evidence. This argument fails for the reasons set forth below.

¶35. In the case sub judice, a hair consistent with that of Austin was found in the pantyhose-type material discovered beneath the house. Additionally, the State had many eyewitnesses to the commission of the crime and to the events immediately connected with it. Austin argues that the State's physical evidence does not link Austin to the robbery by any means other than circumstantial inference. Austin also asserts that the eyewitness testimony, particularly particularly Officer Hooper's testimony, "relies heavily on inference," and should therefore be considered circumstantial evidence.

¶36. Various witnesses observed a "heavy" or "chunky" man with a gun in his hand, wearing a striped shirt and dark trousers, running out of the Payment Center and down the street immediately following the robbery and shooting. The record reveals that several witnesses identified Austin, both soon after the crime and at trial, as the man they had seen running down the street. It is true that some of the witnesses were not certain at the moment they observed the person running in the street that it was actually Austin.

¶37. Officer Charles Hooper, who knew Austin for six years and in high school, observed Austin run past him immediately following the murder of Moore, with a gun in his hand. He testified that "at first" he did not know who the man was, but that he later "figured out" that the man was Austin based on Austin's build and on his hair style. Hooper testified that when he went in to work at the police station that same day, Artis Austin's name came up, and it was at that point that Hooper realized it was Austin he had seen running

down the street. Austin claims that this makes Hooper's identification of him "circumstantial."

¶38. Austin cites no authority, however, for his assertion that initial uncertainty in identification makes a case a circumstantial evidence case for purposes of a circumstantial evidence instruction. Uncertainty in identification at the time of the event does not change the fact that there was unequivocal testimony as to Austin's identity at the time of the trial. Such uncertainty merely goes to the weight and probative value of the identification testimony and, as such is a fact for the determination of the trier of fact. *Gray v. State*, 549 So.2d 1316, 1324 (Miss. 1989). The weight to be given such testimony does nothing to change its status from direct to circumstantial. *Id.* The jury in this case was instructed that the State was required to prove all the elements of the offenses beyond a reasonable doubt. That instruction was sufficient, and this assignment of error is without merit.

## IV. WHETHER, UNDER THE TOTALITY OF THE CIRCUMSTANCES, THE TRIAL JUDGE ERRED IN DENYING AUSTIN'S MOTION FOR A NEW TRIAL?

¶39. In his final assignment of error, Austin contends that the trial court erred by refusing to grant a new trial on the ground that the verdict was contrary to the weight of the evidence. The standard of review on this issue is well settled. As distinguished from a motion for a judgment notwithstanding the verdict, a motion for new trial asks that the jury's guilty verdict be vacated on grounds related to the weight, not the sufficiency, of the evidence presented at trial. *May v. State*, 460 So.2d 778, 781 (Miss. 1984). This Court will not order a new trial unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice. *Groseclose v. State*, 440 So.2d 297, 300 (Miss.1983). The Court will reverse the lower court's denial of a motion for a new trial only if, by denying, the court abused its discretion." *Gleeton v. State*, 716 So.2d 1083, 1089 (Miss.1998). Furthermore, we are to consider all evidence in the light most favorable to the prosecution, accepting all credible evidence consistent with the verdict as true. *Ashford v. State*, 583 So.2d 1279, 1281 (Miss.1991). We must also accept all reasonable inferences drawn from the evidence that are consistent with the verdict. *Id. Ashford* held:

> [O]nce the jury has returned a verdict of guilty in a criminal case, we are not at liberty to direct that the defendant be discharged short of a conclusion on our part that given the evidence, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could find beyond a reasonable doubt that the defendant was guilty.

*Id.* Matters regarding the weight and credibility of evidence must be resolved by the jury. *Fisher v. State*, 481 So.2d 203, 212 (Miss.1985).

¶40. Austin's argument is that conflicting testimony of eyewitnesses resulted in "flaws so serious that they need to be re-examined in a new trial." First, Austin cites the failure of three witnesses to identify Austin at trial. One of those witnesses, Morganti, was crouched behind the counter of the Payment Center at the time Moore was shot. Also, there were various witnesses who did positively identify Austin at trial.

¶41. Second, Austin questions the fact that there was inconsistent testimony regarding the color and description of the clothing worn by the gunman. Many witnesses testified in the case at bar, including young children. Therefore, it is not surprising that minor discrepancies emerged regarding certain details. The aforementioned discrepancies did not call into question the main points of the crime, however.

¶42. Third, Austin calls into question the credibility of Michael Matthews, who positively identified Austin. Austin claims that several others who "purportedly identified" Austin "suffered from credibility problems." Issues of fact and of weight and credibility for the jury to resolve. *Fisher v. State*, 481 So.2d at 212. Although there are some inconsistencies in the testimony presented in this case, the State provided ample evidence to support the jury's verdict. It was possible and reasonable for the jury, upon the evidence at trial, ultimately to conclude that Austin had robbed the Payment Center and shot Moore. To allow this verdict to stand does not sanction an unconscionable injustice, as the record reflects evidence to support the jury's findings. *See [Robinson v. State](#)*, 749 So.2d 1054, 1059 (Miss. 1999); *Eakes v. State*, 665 So.2d 852, 872 (Miss. 1995). Accordingly, this issue is without merit.

## CONCLUSION

¶43. For these reasons, Artis Austin's conviction for capital murder and sentence to life in prison without the possibility of parole are affirmed.

¶44. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT WITHOUT PAROLE IN THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. SAID SENTENCE SHALL RUN CONSECUTIVELY TO ANY AND ALL SENTENCES PREVIOUSLY IMPOSED.**

> **BANKS AND McRAE, P.JJ., SMITH, MILLS, WALLER, COBB, DIAZ AND EASLEY, JJ., CONCUR.**

1. Miss. Code Ann. § 99-19-101(5)(d) provides:

> (5)Aggravating circumstances shall be limited to the following: (d)The capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, aircraft piracy, sexual battery....

2. Miss. Code. Ann. § 97-3-19(2)(e) defines capital murder as the killing of a human being by a person engaged in the commission of a robbery.